UNITED STATES of America

v.

Kamil ABDIRAHMAN, Seaman
Recruit (E–1), U.S. Navy.

NMCCA 200401082.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 2 Oct. 2003.

19 May 2008.

For Appellant: Lt. Kathleen Kadlec, JAGC, USN; Capt Richard Viczorek, USMC.

For Appellee: Maj Wilbur Lee, USMC; Lt. Timothy Delgado, JAGC, USN.

Before the Court En Banc.

## PUBLISHED OPINION OF THE COURT

O'TOOLE, Chief Judge:

This case is before the court for *en banc* reconsideration. In the court's earlier, unpublished decision, a divided panel set aside the findings and the sentence, holding that the trial counsel's closing argument impermissibly commented on the appellant's Fifth Amendment right not to testify and that the military judge's curative instruction was insufficient. *United States v. Abdirahman,* No. 200401082, 2006 WL 4573012, 2006 CCA Lexis 289 (16 Nov. 2006).

A general court-martial composed of enlisted and officer members convicted the appellant, contrary to his pleas, of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920. The appellant was sentenced to confinement for nine months, forfeiture of all pay and allowances, and a bad-conduct discharge. The convening authority (CA) approved the sentence as adjudged.

The appellant initially raised four assignments of error: (1) that the evidence of the rape charge was factually insufficient; (2) that the trial counsel improperly commented on the appellant's failure to testify; (3) that the military judge erred in allowing a nurse practitioner to testify as an expert on rape trauma; and (4) that the military judge erred in allowing testimony about the alleged victim's character for truthfulness before it was attacked by the defense. In his subsequent motions for expedited review, the appellant also alleged prejudice as a result of post-trial delay.

We have carefully considered the record of trial, the appellant's brief and original assignments of error, and his allegation that post-trial delay has prejudiced him. We have also considered the Government's answer and motion for *en banc* reconsideration. We conclude that the cumulative effect of errors in this case requires the findings and sentence to be set aside, with a rehearing permitted. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## I. Background

The prosecution's first witness was the nurse practitioner, who examined the putative victim at the emergency room. The victim, 19–year–old Fireman (FN) O, then testified in detail about the alleged rape and was cross-examined by the trial defense counsel. Afterward, the prosecution presented a character witness to testify to FN O's character for truthfulness. Several other Sailors who had observed FN O shortly after the alleged rape also testified about their observations of her, and related statements FN O made to them. The appellant did not testify or present evidence in his defense. As a result, unless otherwise attributed to

one of the other Government witnesses, this background summary of facts reflects FN O's testimony.

The appellant and FN O were assigned to the same ship and lived in the same barracks. FN O reported to the ship only a few weeks prior to the alleged rape. She knew the appellant by sight, but not by name. Their first interaction was two days prior to the alleged rape. That Friday, FN O was in a shipmate's barracks room, as were the appellant and several others. FN O was talking with a male friend on her cell phone, and ignored the appellant's attempts to start a conversation with her. As he persisted, she went into the bathroom, still talking on the phone. The appellant followed her and stood in the doorway, blocking her exit. FN O said, "Excuse me," but the appellant would not move. He then closed the door and turned off the light. After trying to get the appellant to let her out of the bathroom and failing, FN O gave the appellant her cell phone on which her friend was still engaged. After talking to her male friend on the phone, the appellant relented, saying "Your boyfriend is a bitch," or words to that effect, and then he opened the door. Later that night, and again on Saturday night, FN O saw the appellant at a local club. Both were in the company of other Sailors, and they did not speak or dance with each other.

On Sunday afternoon, FN O encountered the appellant in the barracks laundry room. She accepted his invitation to watch movies with him in his barracks room. Once there, FN O sat on the appellant's bed and briefly looked at two of the appellant's magazines with him, one of which was pornographic. While watching the first movie, FN O sat at the end of the appellant's bed and he sat in a chair drinking Bacardi rum. He offered her a drink, but FN O declined.

During the second movie, the appellant moved from the chair to sit behind FN O on his bed. The appellant made several attempts to touch FN O on the back, and each time, she pushed his hand away. A little later, they engaged in consensual horseplay, during which the appellant tried to pull a Popsicle stick from FN O's mouth, and he tried to kiss her. FN O turned away, telling the appellant, "I can't do this," and said that she had a boyfriend. The appellant ignored FN O's continued protests, held her hands down, and began kissing her. FN O continued to resist, so the appellant stopped and got up from the bed. FN O then resumed watching the second movie from her position seated on his bed.

At some point during the second movie, FN O heard the sound of a belt buckle and clothes dropping, but she testified that she did not turn around to see what the appellant was doing. The appellant then sat close behind her on the bed, with his bare legs extending on either side of her. She said that she saw his legs, but simply thought he had put on shorts. Then, he grabbed her hand and pulled it behind her, placing it on his penis. FN O pulled her hand back and reached forward to get her keys, intending to leave. The appellant pulled her backward onto the bed and tried to kiss her. She again resisted. FN O testified that the appellant then forcibly placed her knees on his shoulders and forcefully pulled off her pants. He then began to rape her, during the course of which she struggled, and he forcibly restrained her. As she struggled and the appellant tried to maintain his advantage, FN O was forced into various positions: she fell partially from the bed; she was pulled back onto the bed; she was pressed against the headboard; and finally, she was "flipped over" from her back onto her stomach. As her position changed, FN O testified that the appellant had to withdraw his penis and penetrate her more than one time. Finally, FN O testified that she told the appellant "no"; she said it "hurts, get it out of me"; and "stop." She testified she did everything she could to physically resist him, but she admitted that she did not scream or yell loud enough for anyone in the barracks to hear her.

After completing the sexual intercourse, the appellant wiped himself and FN O with a towel. He then asked FN O if he hurt her. He also asked, "Well, wasn't that fun?" He then went into the bathroom. FN O put on her clothes and grabbed her belongings to leave. The appellant opened the bathroom door, noticed what FN O was doing, and

asked if she was going to stay and watch the rest of the movie. FN O declined and went to her barracks room. Shortly afterward, the appellant appeared at her room to ask if she was okay and to tell her where he would be if she needed him.

FN O spoke with several shipmates over the course of the next hour, continuing into the evening. The testimony of these witnesses varied in their descriptions of her emotional state. Some testified she was crying and upset, others testified that she was not crying. Some said she seemed sad, quiet or depressed. Upon questioning by these shipmates, FN O acknowledged that she had been raped. Her shipmates urged her to report the matter to barracks personnel and command authorities. As a result of her doing so, Seaman (SN) Myatt learned of the allegations and confronted the appellant, telling him that FN O was accusing him of rape. SN Myatt testified that the appellant appeared surprised, claimed FN O was lying, and said he wanted to talk to her. The appellant told SN Myatt that he had tried "to mess around with her" but that she "wasn't really about doing anything."

That evening, FN O was taken to the hospital to undergo a sexual assault examination. The attending nurse practitioner, Ms. Lake, testified that FN O appeared calm, but that she also appeared to have been crying and was "moderately distressed." Although FN O said she was in pain and had a difficult time with the exam, Ms. Lake noted no evidence of contusions or bruises that might indicate a struggle or forcible rape. Though not tendered or accepted by the court as an expert witness, Ms. Lake was also permitted to testify, over a defense objection, that, in her experience, a lack of bruises was not uncommon for a rape victim. A subsequent DNA analysis confirmed the presence of the appellant's semen on cervical swabs taken from FN O.

## II. Sufficiency of the Evidence

In his first assignment of error, the appellant contends the evidence that he raped FN O was factually insufficient. He argues that, as related at trial by FN O, the facts are more consistent with consensual sex. We disagree.

### A. Principles of Law

Military courts of criminal appeals must determine both the factual and legal sufficiency of the evidence presented at trial. *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987); *see* Art. 66, UCMJ. In reaching our decision regarding the legal and factual sufficiency of the evidence, we have disregarded the evidence admitted in error. *Cf. United States v. Holt,* 58 M.J. 227, 232 (C.A.A.F.2003). The test for factual sufficiency is whether, after weighing all of the evidence in the record of trial and making allowances for the lack of personal observation, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325. The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Id.* The term "reasonable doubt" does not mean the evidence must be free of conflict. *United States v. Reed,* 51 M.J. 559, 562 (N.M.Ct.Crim.App.1999), *aff'd,* 54 M.J. 37 (C.A.A.F.2000). The fact-finder may "believe one part of a witness' testimony and disbelieve another." *United States v. Harris,* 8 M.J. 52, 59 (C.M.A.1979).

### B. Analysis

■ FN O testified that the appellant, a person she did not know well, acted aggressively toward her, trapping her for a time in a darkened bathroom. Her testimony is clear that, two days later, regardless of how events unfolded during that afternoon, at one point during the second movie, the appellant overpowered her, forcefully removed her pants and, against her explicit protestations, had intercourse with her. She told her fellow shipmates of the rape within 30 minutes to an hour afterward, and then reported the alleged rape to barracks and command authorities in a timely fashion. She was described as crying or upset by several witnesses who encountered her in the hours following the incident, including the nurse practitioner who assessed FN O as "moderately distressed."

While the defense was able to show minor inconsistencies in FN O's testimony from previous statements she made at the Article 32, UCMJ, investigation, we find nothing in the record to render her testimony facially incredible. Indeed, insubstantial inconsistencies in her testimony about the rape are what the majority of this court would expect from any witness subjected to a violent crime: fractions of memory, pieced together into a narrative, vivid in some aspects, but at times chronologically ill-fit.

We do not view the substantive evidence in this record as consistent with consensual intercourse, as urged by the appellant on appeal. Specifically to the contrary is SN Myatt's testimony, which established that the appellant denied that he and FN O engaged in any sexual conduct at all, because she rejected his advances. The latter portion of the appellant's statement is key: in it the appellant affirmatively corroborates FN O's testimony that she rebuffed his advances. Thus, statements from both the alleged perpetrator and his victim were consistent: FN O did not consent to sexual intercourse. In the absence of her consent, FN O's testimony, corroborated by the DNA analysis, proved the intercourse nevertheless occurred. In this context, the appellant's denying that he had intercourse with FN O does not support a conclusion that there was intercourse and that it was consensual; rather, it indicates a consciousness of guilt.

Considering the properly admitted evidence in the light most favorable to the Government, we conclude that a rational fact finder could have found all the elements of rape beyond a reasonable doubt. After weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, the majority of this court is also convinced of the appellant's guilt beyond a reasonable doubt. That, however, does not end our analysis.

### III. Testimony of the Nurse Practitioner

In his third assignment of error, the appellant avers that the military judge erred in allowing a nurse practitioner to testify as an expert on rape trauma.

### A. Additional Facts

Ms. Lake is a nurse practitioner with three and one-half years experience in treating sexual assault victims and in gathering forensic evidence from them. She testified she treated about 16 suspected victims of sexual assault during each of the previous three years. She was working in the emergency department of Mid–Coast Hospital around midnight when she first observed FN O. After Ms. Lake described FN O as quiet and very calm, but with red eyes, indicating she had been crying, the trial counsel asked her: "Is that common for rape victims?" Ms. Lake answered affirmatively. The defense counsel immediately objected that he was not provided notice of an expert witness.[1] The military judge overruled the objection on the basis that he did not believe trial counsel was soliciting expert testimony. Record at 189.

Ms. Lake thereafter testified about the pelvic examination she conducted of FN O, and indicated that she did not see signs of bruises or contusions during her examination. Trial counsel asked, "Is that uncommon for a rape victim?" She responded negatively. The defense counsel again objected to the question on the basis that it elicited expert testimony. The trial counsel responded that he was not soliciting expert testimony from Ms. Lake, but, rather, her observations of FN O. The military judge ruled the witness was not testifying as a rape trauma expert, and he thereafter rephrased the question for the trial counsel to elicit testimony "within her experience." *Id.* at 191, 193.

The appellant contends on appeal that the military judge erred by allowing Ms. Lake to testify as an expert. We agree.

### B. Principles of Law

We review the military judge's ruling on the admissibility of evidence under an abuse of discretion standard, under which we assess whether the military judge's findings of fact were clearly erroneous or whether the decision was influenced by an erroneous view

---

1. RULE FOR COURTS-MARTIAL, 703(d), MANUAL FOR COURTS-MARTIAL, UNITED STATES, (2002 ed.) requires, in part, notice to the opposing party upon the employment of an expert.

of the law. *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F.2003).

## C. Analysis

■ The military judge was correct in concluding that observations of physical trauma and emotional state are facts with which a nurse practitioner would be expected to be experienced, and that these facts are equally susceptible of routine observation by anyone in a position to observe them. MILITARY RULE OF EVIDENCE 701, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.). Nevertheless, Ms. Lake's testimony went beyond a routine observation. She provided an opinion regarding whether FN O's physical and emotional conditions were "common" or "not uncommon" compared with other rape victims. Record at 189, 193. As this court stated in *United States v. Silvis*, 31 M.J. 707, 710 (N.M.C.M.R.1990), the standard for what constitutes rape trauma syndrome evidence is "not the direct nor circumstantial evidence of the subsequent emotional or psychological condition of the victim, standing alone, but the combination of such evidence as a foundation for, and together with, *opinion* evidence that the victim's emotional or psychological condition is consistent with that characteristically exhibited by rape victims." (Emphasis in original).

Ms. Lake's testimony regarding her observations of FN O's emotional and physical conditions prior to and while examining her were permissible. MIL. R. EVID. 701; *see Silvis*, 31 M.J. at 710. However, Ms. Lake's testimony became expert testimony when she described FN O's conditions as in common with those displayed by rape victims more generally. MIL R. EVID. 701. Such expert opinion supported the Government's case by reconciling possible misconceptions about FN O's condition and behavior with those of other rape victims. *United States v. Suarez*, 35 M.J. 374, 376 (C.M.A.1992).

We find the military judge abused his discretion by allowing Ms. Lake to testify when the Government failed to provide the required notice to the defense of an expert witness. RULE FOR COURTS-MARTIAL 703(d), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.). Moreover, the trial counsel did not provide an adequate foundation to qualify the expert and to establish the testimony was reliable. MIL. R. EVID. 702.[2] Finally, the military judge did not provide an instruction under which the members were guided in their assessment of the expert testimony. *See United States v. Fountain*, 2 M.J. 1202, 1220 (N.C.M.R.1976). In a case such as this, where the Government's case substantially depends on the testimony of the putative victim, the erroneous admission of expert testimony in support of the putative victim's testimony raises doubt about whether, in the absence of the expert testimony, the same verdict would still have been reached by the members. Even if this error could be determined to be harmless in isolation, we find that, combined with other errors in this case, it contributes to a fatal level of cumulative error, as discussed *infra*.

## IV. Excited Utterances

Next, although not assigned as an error on appeal, we consider whether the military judge erred by admitting hearsay statements of FN O to several people. These statements came into evidence through the testimony of FN O, FN Murray, and FN Halstead.

## A. Additional Facts

Prior to trial, the Government moved to admit the statements made by FN O to FN Murray approximately 30 minutes after the alleged rape. The Government urged that FN O's statements were admissible as excited utterances under MIL. R. EVID. 803(2). Appellate Exhibit XIV. The defense opposed the motion, and moved *in limine* to exclude FN O's statements to FN Murray and FN Halstead. AE XV.

At the hearing held to resolve these motions, FN O testified that, after the alleged rape, she returned to her room. Thereafter,

---

2. MIL. R. EVID. 702 provides that a witness may be qualified as an expert by reason of "knowledge, skill, experience, training, or education" if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

she spoke to FN Stanton, but did not tell him about the alleged rape. She then attempted to telephone various people, ultimately speaking to Dennis Carmichael and someone named Burt. FN O testified that in the course of her conversation with Carmichael, during which she described the appellant as having touched and kissed her, she testified that Carmichael surmised she had been raped, which she then confirmed. Record at 321. FN O testified to having had a similar conversation with Burt, after which she began to fall asleep. It was then that she heard FN Murray knock at her door. *Id.* at 258–59.

When FN Murray came to her room, FN O was not crying. The two talked for a while. At one point, FN O said, "You're not going to believe what happened," and then told FN Murray, "I was in [the appellant's] room and we were looking at movies and stuff, and he was all getting close or whatever to me," and was "being all touch and kissy." FN O testified that FN Murray "finished my sentence, like, 'Did he rape you?' and I was like 'yeah'." *Id.* at 65. After the disclosure of rape, FN Murray went to get FN Halstead. FN O testified she started to cry as FN Murray left. FN Halstead, upon coming to FN O's room, asked what was wrong. FN O said she started to cry, and was speechless. She said she looked to FN Murray for guidance, and FN Murray said, "Well, Abdirahman raped her." *Id.* at 66–67.

FN Murray testified on the motion that FN O did not appear to have been crying when she entered the room. FN O said she needed to talk to her, and then told her she had been in the appellant's room watching a movie, he had tried to kiss her, she had tried to fight him off, and he had taken her pants off. FN Murray asked FN O, "Did he rape you?" FN O replied, "Yes," and then began to cry. *Id.* at 71–72. At trial, FN Murray added she did not think FN O was in a state of shock during this encounter, but was "kind of sad." *Id.* at 206.

FN Halstead testified on the motion that when she arrived at FN O's room, she sat on the bed next to FN O and asked her what it was she wanted to talk about. FN O was shaking and crying. FN O first said the appellant had tried to kiss her, to which FN Halstead replied, "All right. So?" Then, FN O said the appellant had raped her.

The military judge ruled from the bench that the victim's statements were admissible as excited utterances, or alternatively as residual hearsay. *Id.* at 76. The military judge found that FN O was still under the stress and excitement of a startling event when she made the statements, that the statements were not the result of reflection or fabrication, and that the totality of the circumstances indicated the statements were trustworthy. He did not specify the indicia of trustworthiness upon which he relied.

## B. Principles of Law

As previously set forth, we ordinarily review a military judge's ruling admitting or excluding evidence for abuse of discretion. We will reverse that ruling where the judge's findings of fact are clearly erroneous or his decision is influenced by an erroneous view of the law. *Feltham,* 58 M.J. at 474.

Generally, out of court statements may not be offered as proof of the matters asserted therein. MIL. R. EVID. 801(c), 802. Despite this general prohibition on hearsay, a statement relating to a startling event or condition, made while the declarant was under the stress of excitement caused by the event or condition, is admissible as an "excited utterance." MIL. R. EVID. 803(2). Excited utterances have long been admissible as an exception to the rule against hearsay on the assumption that "persons are less likely to have concocted an untruthful statement when they are responding to the sudden stimulus of a startling event." *Feltham,* 58 M.J. at 474 (quoting *United States v. LeMere,* 22 M.J. 61, 68 (C.M.A.1986))(internal quotations omitted). The reason such a statement may be expected to be truthful is because of the "lack of opportunity to fabricate." *Id.* (quoting *United States v. Jones,* 30 M.J. 127, 129 (C.M.A.1990))(internal quotations omitted).

■ Our superior court has articulated a three-prong test for determining whether a hearsay statement qualifies as an excited ut-

terance: (1) the statement must be spontaneous, excited, or impulsive, rather than the product of reflection and deliberation; (2) the event prompting the utterance must be startling; and (3) the declarant must be under the stress of excitement caused by the event. *Id.* (citing *United States v. Arnold,* 25 M.J. 129, 132 (C.M.A.1987)); *United States v. Donaldson,* 58 M.J. 477, 482 (C.A.A.F.2003).

■ To determine whether a declarant was under the stress of a startling event at the time of a statement, courts look to a number of factors, such as " 'the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement.' " *Donaldson,* 58 M.J. at 483 (quoting *Reed v. Thalacker,* 198 F.3d 1058, 1061 (8th Cir.1999)). The premise that excited utterances are truthful becomes more tenuous "where the exciting influence has dissipated and one has had the opportunity to deliberate or fabricate." *Id.* "[T]he existence of a deliberative period increases the concern that subsequent statements will be inaccurate or contrived." *Id.* "As a general proposition, where a statement relating to a startling event does not immediately follow that event, there is a strong presumption against admissibility under [MIL. R. EVID.] 803(2)." *Id.* at 484 (citing *Jones,* 30 M.J. at 129).

■ Where a hearsay statement does not qualify as an excited utterance, it may still be admissible under the residual hearsay exception found in MIL. R. EVID. 807. *United States v. Grant,* 42 M.J. 340, 343 (C.A.A.F. 1995). However, as Chief Judge Effron noted in *Donaldson,* 58 M.J. at 489, "the legislative history of the residual hearsay exception indicates that the exception should be used 'very rarely, and only in exceptional circumstances'. . . . The express exceptions to the hearsay rule are tightly drawn and are limited to circumstances that offer assurance of reliability. [MIL. R. EVID.] 807 requires that the circumstances of the making of a statement offered under the residual hearsay exception provide the same degree of assurance of reliability as is found under the specific

exceptions." *Id.* (Effron, J., concurring in part and in the result)(quoting *United States v. Kelley,* 45 M.J. 275 (C.A.A.F.1996)).

## C. Analysis

■ The military judge did not make findings of fact to support his conclusion that FN O was still under the stress and excitement of a startling event when she made the statements. He made no findings to support his further conclusion that her statements were not the result of reflection or fabrication. To the contrary, the record shows her statements to Carmichael, Murray, and Halstead were made 30 minutes or longer after the alleged rape. Testimony was conflicting about whether FN O was crying during the various statements, but there was scant evidence to the effect that she was in a state of excitement. Indeed, FN Murray testified that she was not in a state of shock, describing her as "sad." FN O's own testimony was that she had begun to fall asleep immediately prior to making a statement to SN Murray. These factors indicate a substantial dissipation of the impact of the exciting event. Of concern, too, is that the circumstances surrounding her statements show not only a lapse of time, but a lack of spontaneity. Her statements that she was raped were not blurted out or even initiated by FN O. They were made in the course of multiple, separate conversations, and they were made in response to questions by the witnesses who subsequently testified. The facts here are more indicative of reflective comments than of excited utterances. As a result, the military judge's limited findings are unsupported by the record. As noted above, where a proffered excited utterance does not immediately follow the startling event, there is a strong presumption against admissibility. *Donaldson,* 58 M.J. at 484. We find that the facts of record do not overcome this presumption. The military judge's ruling admitting the several hearsay statements tendered as excited utterances was, therefore, clearly erroneous.

■ We also do not find that FN O's statements meet the standard for admissibility as residual hearsay. First, they are not the most probative evidence of the points for

which they are offered. Although not explicitly identified by the trial counsel, presumably the material fact of which these statements are evidence is the fact of FN O's rape by the appellant. In this case, the most probative evidence of that fact is clearly FN O's in court testimony about the events of that evening. Second, these statements are simply prior consistent statements that bolster the credibility of the victim-witness. Such a use is not permitted absent an allegation of recent fabrication, MIL. R. EVID. 608(a), which did not arise in this case. Third, although the military judge held that the totality of the circumstances indicated the statements were trustworthy, he did not identify those indicia of trustworthiness. The only indicia of trustworthiness were those by which the Government sought to admit the hearsay statements as excited utterances. Having fallen short of validating the hearsay on that basis, we do not now find that these facts rise to the level of exceptional circumstances ensuring the trustworthiness of the tendered hearsay, as anticipated by MIL. R. EVID. 807. Consequently, we hold the military judge abused his discretion by admitting, as residual hearsay, FN O's statements to Dennis Carmichael, FN Murray, and FN Halstead.

As previously indicated, in a case of this nature, dependent as it is on the testimony of a central witness—the putative victim—it is difficult to know how important these improperly admitted, prior consistent statements were to the members' evaluation of the victim's credibility. It is, however, unnecessary to determine with any degree of precision whether this error was materially prejudicial on its own, or only somewhat prejudicial, but harmless. That is because we conclude that the repeated introduction of these hearsay statements, even when the essential information was otherwise properly before the court, contributes to a fatal level of cumulative error, as discussed *infra.*

## V. Bolstering Victim's Character for Truthfulness

In his fourth assignment of error, the appellant argues that the military judge erred by allowing Chief Engineman (ENC) Timothy Gribbon, U.S. Navy, to testify in the Government's case-in-chief that, in his opinion, the victim was a truthful person. The Government counters that the defense put the victim's character for truthfulness in question by its opening statement and cross-examination of the victim.

### A. Additional Facts

During opening statement, the trial defense counsel told the members the victim's testimony would be key to the case. He advised the members to watch her as she testified, and to ask themselves if what she was saying made sense, was consistent and truthful. Record at 183–84. During cross-examination of the victim, the trial defense counsel pointed out numerous inconsistencies between the victim's testimony at trial and her testimony at the pretrial investigation pursuant to Article 32, UCMJ. Many of these inconsistencies concerned collateral details of the encounter. For example, counsel questioned the victim about whether the accused told her the drink he offered was a Bacardi cocktail, or whether she saw that fact herself on the bottle. *Id.* at 275–76. Similarly, counsel questioned the victim about an inconsistency concerning whether the accused or the victim opened the Bacardi bottle. *Id.* at 278.

After confronting FN O with the inconsistency about how she knew the offered drink was a Bacardi cocktail, counsel asked her if she had told the truth at the Article 32 investigation. She responded that she had. He then asked her if she was telling the truth at trial. She said she was. Then, after asking about who opened the bottle of Bacardi, counsel said, "Today, under oath, before these members and this judge, you said that [the accused] opened the bottle ... but at the 32, also under oath, you said that you opened the bottle?" FN O responded, "I didn't open the bottle." *Id.* at 275–78.

Some of the inquiry into inconsistencies addressed matters more directly related to the alleged rape. For example, counsel pointed out that the victim had been inconsistent about how many times the accused kissed her on the mouth, about whether the accused got off the bed at a particular point, whether her right leg had been around the

accused or just lying over his side, whether her panties were at mid-thigh or were completely removed at the time of penetration, and whether, during the struggle, she had tried to get away from the bed or pull herself back up onto the bed. *Id.* at 298, 300, 304, 307, 310.

At the conclusion of FN O's cross-examination by the trial defense counsel, the Government offered ENC Gribbon's opinion of the victim's character for truthfulness. The defense objected on the basis of foundation, but the military judge overruled that objection. *Id.* at 373. The defense did not object on the basis that ENC Gribbon's testimony was improper bolstering.

## A. Principles of Law

Error may not be predicated on a ruling that admits evidence unless the ruling materially prejudices a substantial right of the appellant, and a timely objection was made, stating the specific ground of objection, if the specific ground was not apparent from the context. MIL. R. EVID. 103(a). This court may, nevertheless, take note of a plain error that materially prejudices substantial rights, even though it was not brought to the military judge's attention. MIL. R. EVID. 103(d). To establish plain error, the appellant must demonstrate that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right. *See United States v. Finster,* 51 M.J. 185, 187 (C.A.A.F.1999); *United States v. Powell,* 49 M.J. 460, 463–65 (C.A.A.F.1998).

The credibility of a witness may be supported by evidence in the form of opinion or reputation, but evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked. MIL. R. EVID. 608(a). The means by which credibility may be attacked is immaterial. *United States v. Woods,* 19 M.J. 349, 349 (C.M.A.1985).

The mere fact a witness has testified does not give rise to a right to bolster the witness's credibility with evidence of his or her character for truthfulness. *United States v. Everage,* 19 M.J. 189, 192 (C.M.A.1985)(citing *United States v. Jackson,* 588 F.2d 1046 (5th Cir.1979)); neither does the mere fact of conflicts between the witness's testimony and other evidence. *United States v. Varela,* 25 M.J. 29, 31 (C.M.A. 1987)(per curiam); *Everage,* 19 M.J. at 192. *See also United States v. Danehy,* 680 F.2d 1311, 1314 (11th Cir.1982); *United States v. Angelini,* 678 F.2d 380, 382 n. 1 (1st Cir. 1982).

An extensive, slashing cross-examination, however, may be sufficient to place the witness's character for truthfulness at issue. *Varela,* 25 M.J. at 31; *Everage,* 19 M.J. at 193, 194; *United States v. Porta,* 14 M.J. 622, 624 (A.F.C.M.R.1982); *United States v. Halsing,* 11 M.J. 920 (A.F.C.M.R. 1981).

## C. Analysis

Because the appellant did not object to the testimony of ENC Gribbon as improper bolstering, he forfeited any claim of error on that basis, absent plain error. After examining the record, we conclude it was error, though not plain error, for the military judge to have admitted ENC Gribbon's testimony.

Neither the defense counsel's opening statement nor his cross-examination of the putative victim put her character for truthfulness at issue. The opening statement merely asked the members to view the victim's testimony with a critical eye; it did not suggest a motive to lie, contend that she would lie, or otherwise imply that she was an untruthful person. Clearly, by his cross-examination of FN O, the defense counsel attempted to undermine the member's confidence in the reliability of her testimony. That examination, however, was not a slashing attack on the witness's veracity, putting her character for truthfulness at issue. Rather, the clear implication of the examination was that the victim was unreliable, given the numerous inconsistencies in her various statements about the events of that evening. Consequently, it was error to admit ENC Gribbon's opinion about the victim's character for truthfulness.

Nevertheless, we conclude that the error, in and of itself, was neither obvious nor substantially prejudicial to a material right of

the appellant. ENC Gribbon testified that the victim had worked on minor maintenance and cleaning tasks in his division on the ship, five to seven days a week, for about four and a half months, and that he believed she was a truthful person. Given the witness's limited experience with the victim, we find that his opinion of her character for truthfulness was of questionable assistance to the members in evaluating the victim's testimony, and that its admission was not, alone, materially prejudicial.

Accordingly, we decline to grant relief on this basis alone. Nevertheless, this error contributed to the cumulatively prejudicial effect of all the errors.

### VI. Improper Argument

In his second assignment of error, the appellant avers that the trial counsel's repeated references to the evidence as "undisputed" during closing argument was an improper comment on the appellant's Fifth Amendment right not to testify in this case, where only the appellant could have disputed the details of the rape as testified to by the putative victim. While we agree that, under the circumstances of this case, the trial counsel's argument was improper, we find the military judge's curative instruction was adequate.

### A. Additional Facts

During closing argument on the merits, the trial counsel referred to the evidence presented by the prosecution as "undisputed" 11 times in her closing argument, and used the words "never disputed," or similar language, seven times in her rebuttal argument. Record at 399–400, 406–07. Many of the "facts" which the trial counsel argued were "never disputed" involved details of the sexual encounter in the appellant's room, which could only have been disputed by the appellant testifying-there were no other eyewitnesses. Specific "undisputed" facts included testimony that FN O never consented to sexual intercourse, that she repeatedly told the appellant to stop, that the appellant forcibly removed her clothes, that he flipped her over on the bed, and that she tried to crawl away from him. The trial counsel's argument also generally asserted that all the details concerning the rape were undisputed. *Id.*

The trial defense counsel did not object to these comments until after arguments were completed, and the military judge had instructed the members on findings. The objection was made during an Article 39(a), UCMJ, session just prior to the members' deliberations on findings. In response to the objection, the trial counsel explained that her characterization of the evidence as undisputed was intended to highlight that the defense cross-examination of FN O was ineffective, focused only on immaterial details, and failed to impeach her testimony on the material facts concerning the rape. The military judge said he did not find the trial counsel's argument improper, but expressed concern that the members might interpret the remarks as a comment on the appellant's decision not to testify. *Id.* at 417.

The military judge decided to give a curative instruction, and provided both counsel with the wording of his proposed instruction. The defense counsel offered no objection. The members were recalled to the courtroom, where the military judge addressed them as follows:

> "Members, before I send you to the deliberation room, I just want to clarify one issue by repeating some of the instructions I gave you before, briefly. I was concerned that you misinterpret or misapply Trial Counsel's reference to unrebutted facts, and in that argument that reference was not a comment on the accused not testifying. The accused has an absolute right to remain silent. You will not draw any inference adverse to the accused from the fact that he did not testify as a witness. You must disregard the fact that the accused has not testified. I also remind you that arguments of counsel are not evidence in this case."

Record at 421. Following this instruction, the members exited the courtroom to begin their deliberation on findings.

### B. Principles of Law

 It is well-established that a trial counsel may not comment on the fact that an accused did not testify in his own defense,

either "directly, indirectly or by innuendo." *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A.1990)(citing *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). Commenting on the evidence using terms such as "unchallenged and undisputed," however, are not indirect comments on an accused's silence absent "other circumstances" that "so color the reference as to make the implication apparent." *United States v. Saint John*, 48 C.M.R. 312, 315, 1974 WL 13823 (C.M.A.1974). The prosecution is not prohibited from making comments that constitute a fair response to claims made by the defense. *United States v. Gilley*, 56 M.J. 113, 120 (C.A.A.F.2001). A constitutional violation occurs only where the accused is the sole source capable of contradicting the Government's evidence, or where the jury would necessarily interpret trial counsel's argument as a comment on the accused's failure to testify. *United States v. Webb*, 38 M.J. 62, 66 (C.M.A.1993). To determine whether the trial counsel's statements constituted an impermissible reference to the appellant's right not to testify, or were a fair response to the defense theory of the case, we must examine them in light of their context within the entire court-martial. *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000).

Finally, since the trial defense counsel did not object to the military judge's instructions to the members on findings, the objection was waived, absent plain error. R.C.M. 919(c). To prevail under a plain error analysis, the appellant must persuade this court that there was error, that the error was plain, and that it materially prejudiced his substantial rights. *Powell*, 49 M.J. at 463–65. Once the appellant meets his burden, the burden shifts to the Government to convince us that this constitutional error was harmless beyond a reasonable doubt. *United States v. Carpenter*, 51 M.J. 393, 396 (C.A.A.F.1999).

## C. Analysis

■ It is true that, in this case, there was no evidence of screams, no evidence of physical injuries, no physical evidence of a struggle, and no witnesses to the alleged rape, other than the appellant and the putative victim. Some of these factors could be argued to dispute the Government's case. However, the principal method by which the appellant could dispute FN O's testimony that he forcibly removed her clothes—or any of the other intimate details of the rape characterized as "undisputed" by trial counsel—would be to contradict her testimony with his own. Thus, the trial counsel's argument, which was not tailored to address weaknesses in the defense cross-examination of FN O, constituted an impermissible reference to the appellant's decision not to testify.

Although we find the trial counsel's argument was error, and an obvious error, we do not find that it alone is reversible error because the military judge's curative instruction rendered the error harmless beyond a reasonable doubt. The military judge's instruction was a clear and correct statement of the law, and the defense raised no objection to it. The instruction was given immediately before the members retired for deliberation, thus highlighting the applicable law at a point where it would be fresh in their minds.

We find no defect in the instruction because the military judge failed to characterize the trial counsel's argument as improper. First, the defense in this case did not object to the military judge's instruction, and thus waived any defect absent plain error. Second, we find no requirement that a military judge must find error before a curative instruction can be given to prevent prejudice from a possible defect in the trial. *United States v. Mobley*, 34 M.J. 527 (A.F.C.M.R. 1991), *aff'd* 36 M.J. 34 (C.M.A.1992). Finally, we presume the members understood and followed a military judge's instruction in the absence of evidence to the contrary. *United States v. Holt*, 33 M.J. 400, 408 (C.M.A.1991). We find no such evidence here. Thus, even had we found that the military judge erred by not first advising the members that the trial counsel's argument was improper, we would find no substantial prejudice to the appellant's material rights; however, given the excessive number of improper references by the trial counsel, and the somewhat unfo-

cused curative instruction, we are unable to conclude that no trace of prejudice remains.

## VII. Cumulative Error

■ Although we find none of the assignments of error raised by the appellant, or otherwise considered by this court, constitute reversible error individually, we find that the accumulation of errors described *supra* require us to evaluate the fairness of the appellant's trial using the cumulative-error doctrine. *United States v. Dollente,* 45 M.J. 234, 242 (C.A.A.F.1996); *see also United States v. Banks,* 36 M.J. 150, 171 (C.M.A.1992). Our superior court has recognized that the scope of our evaluation of the errors in a case should be made "against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case." *Dollente,* 45 M.J. at 242 (quoting *United States v. Sepulveda,* 15 F.3d 1161, 1196 (1st Cir. 1993)). This review necessarily includes "all errors preserved for appeal and all plain errors." *Id.* (quoting *United States v. Necoechea,* 986 F.2d 1273, 1282 (9th Cir.1993)). As well, the court should consider any "traces" of prejudice which might remain even after an error is cured by instruction. *Necoechea,* 986 F.2d at 1282.

As in *Dollente,* the prosecution's case against the appellant rested principally on the putative victim's credibility. We, therefore, find an interrelationship between the nurse practitioner's improper testimony as an expert—which sought to portray her clinical observations of the alleged victim as "common for rape victims"—and the prosecution's improper use of hearsay and character testimony. All three of these Government tactics incrementally bolstered the alleged victim's credibility. In addition, where the appellant elected not to testify at trial, and presented no case-in-chief, we also find an interrelationship between enhancing the credibility of the Government's central witness and the trial counsel's improper argument referring to the Government's case as

"undisputed," which concomitantly cast in a negative light the appellant's constitutional rights not to testify and to hold the Government to its burden of proof.

There was no corrective action taken at trial regarding the improper admission of the putative victim's character for truthfulness or the improper admission of her hearsay statements about the alleged rape. The military judge did attempt corrective action at trial regarding the nurse practitioner's testimony and the trial counsel's improper argument. We find, however, that he did so in a minimalist fashion. For example, the appellant's objection to the nurse practitioner's testimony was resolved in open court, in front of the members, rather than in an Article 39(a), UCMJ, session. There was an inadequate foundation to establish the nurse's expertise, and there was no instruction to the members regarding the use of her testimony. Record at 189. When the defense counsel objected to the trial counsel's use of the word "undisputed" during her closing argument, the curative instruction used by the military judge, though sufficient under ordinary circumstances, was not sufficient to eliminate all trace of prejudice in this case. Those traces include that his instruction did not account for the excessive number of times the trial counsel used terms such as "undisputed"; it did not characterize the trial counsel's argument as "improper"; and it did not directly address the import of the argument where only the appellant could have disputed certain details. *Id.* at 421. Within the context of this case, we question the efficacy of the military judge's handling of these two issues when they arose at trial.

Though we did not set aside the verdict of the members on the basis that it is factually insufficient, that is not to say that we consider the prosecution's evidence overwhelming. We must acknowledge that the Government's evidence was centrally focused on the testimony of the alleged victim. Cast against that backdrop, we cannot conclude with fair assurance that the cumulative impact of the errors in this case, which preserved and enhanced the stature of the Government's central witness, did not substantially affect the judgment in the appellant's trial. *Dollente,*

45 M.J. at 243 (citing *Banks,* 36 M.J. at 162 and *United States v. Walker,* 42 M.J. 67, 74 (C.A.A.F.1995)). We must, therefore, vacate the findings.

## VIII. Post–Trial Delay

Finally, the appellant argues that he has been prejudiced by the post-trial delay, claiming "he has now been denied citizenship due to the presence of [his] conviction that was set aside without prejudice in November, 2006." Appellant's Partial Consent Motion for Leave to File Second Motion for Expedited Review and Alternatively, Oral Argument of 30 Jan 2008 at 1 (hereinafter, motion). He also claims that "[t]he Government is free to hold a rehearing in [his] case and the delay is only exacerbating [his] ability to present a defense if a rehearing does take place." *Id.* at 2.

### A. Principles of Law

This case was originally tried in 2003. Though not directly applicable, in light of *United States v. Moreno,* 63 M.J. 129, 135 (C.A.A.F.2006), and *United States v. Allison,* 63 M.J. 365 (C.A.A.F.2006), we will assume, without deciding, that the appellant was denied his due process right to speedy post-trial review and appeal. We now test for harm and prejudice. *United States v. Haney,* 64 M.J. 101, 108 (C.A.A.F.2006)(citing *United States v. Harvey,* 64 M.J. 13, 25 (C.A.A.F.2006)).

■■■ We evaluate prejudice to the appellant in light of three interests: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *United States v. Toohey,* 63 M.J. 353, 361 (C.A.A.F.2006)(quoting *Moreno,* 63 M.J. at 138–39).

### B. Analysis

#### 1. Oppressive Incarceration Pending Appeal

■■■ "This sub-factor is directly related to the success or failure of an appellant's sub-

stantive appeal. If the substantive grounds for the appeal are not meritorious, an appellant is in no worse position due to the delay, even though it may have been excessive." *Moreno,* 63 M.J. at 139 (citation omitted). Conversely, "if an appellant's substantive appeal is meritorious and the appellant has been incarcerated during the appeal period, the incarceration may have been oppressive." *Id.*

In this case, the appellant was sentenced to nine months of confinement. Based on his 43 days of pretrial confinement credit and the duration of the adjudged confinement, we conclude that the appellant had served all of his confinement prior to the date on which post-trial processing should reasonably have been completed, even if timely accomplished under the time parameters articulated in *Moreno.* As a result, the delay in this case has not resulted in any confinement that otherwise would not have been served. Accordingly, we find that the appellant has suffered no prejudice as a result of post-trial delay that could be termed oppressive incarceration. *See Moreno,* 63 M.J. at 139.

#### 2. Anxiety and Concern

In evaluating this sub-factor, our superior court has held that:

> "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision. This particularized anxiety or concern is thus related to the timeliness of the appeal, requires an appellant to demonstrate a nexus to the processing of his appellate review, and ultimately assists this court to 'fashion relief in such a way as to compensate [an appellant] for the particular harm.'"

*Moreno,* 63 M.J at 140 (quoting *Burkett v. Fulcomer,* 951 F.2d 1431, 1447 (3d Cir.1991)).

The appellant asserts that he suffered prejudice because he was denied United States citizenship during the delay attending post-trial processing of this case. He submits as evidence a Certified Notice of Decision from the United States Citizenship and

Immigration Services, Department of Homeland Security, dated 28 January 2008. However, this notice does not reflect a final decision. It reads: "If you desire to request a review hearing on this decision pursuant to Section 336(a) of the [Immigration and Nationality] Act, you must file a request for a hearing within 30 days of the date of this notice." The notice also stated that the decision concerning the appellant was made without prejudice to his filing a new application for citizenship in the future.

Additionally, the appellant has not provided any evidence that, but for his court-martial conviction, he otherwise met the requirements for naturalization set forth in 8 U.S.C. § 1427 and 8 C.F.R. Part 316. He has not provided any evidence with regard to whether he appealed the notice prior to its becoming final. He has not identified what impact, if any, the setting aside of findings of guilty would have on the determination of his eligibility for citizenship. Finally, he has provided no evidence as to whether he reapplied for citizenship and, if so, what result he obtained. We conclude that the appellant has failed to substantiate any prejudice with regard to the denial of his citizenship application.

## C. Impairment of a Defense at a Rehearing

The appellant contends that post-trial delay is "exacerbating" his ability to present a defense in the event of a rehearing. "In order to prevail on this [sub] factor an appellant must be able to specifically identify how he would be prejudiced at rehearing due to the delay. Mere speculation is not enough." *Moreno*, 63 M.J. at 140–41. Although the appellant claims prejudice, his pleading asserts only that the prejudice is the harm he could potentially suffer if a rehearing is authorized. Such a position fails to "identify any specific harm that he would encounter at a rehearing and he has therefore failed to establish prejudice under this sub-factor." *Id.* at 141.

Having found no specific prejudice that requires remediation, we next reviewed the delay in this case to determine whether it was so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *Toohey,*

63 M.J. at 362. We find that it does not. As a result, no relief is warranted on that basis.

Finally, we are aware of our authority to grant relief under Article 66, UCMJ. However, in the absence of demonstrated prejudice, and considering our disposition of the other issues in this case, we choose not to exercise it. *United States v. Simon,* 64 M.J. 205 (C.A.A.F.2006); *Toohey v. United States,* 60 M.J. 100, 102 (C.A.A.F.2004); *United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F. 2002); *United States v. Brown,* 62 M.J. 602 (N.M.Ct.Crim.App.2005)(en banc).

## IX. Conclusion

The findings of guilty and the sentence are set aside. A rehearing may be ordered. The record is returned to the Judge Advocate General for transmission to the convening authority for such further action as is deemed appropriate, consistent with this decision.

Senior Judge FELTHAM, Senior Judge WHITE, Judge MITCHELL, Judge VINCENT, Judge STOLASZ, and Judge COUCH concur.

GEISER, Senior Judge (dissenting as to Part II and the result).

I concur with the majority's analysis of the various errors present in the record of trial. I dissent, however, with respect to their finding that the evidence was factually sufficient to support the finding of guilty.

The evidence that Fireman (FN) O did not consent to sexual intercourse with the appellant rests almost entirely on the victim's testimony. According to FN O, her first encounter with the appellant was when he followed her into a barrack's room head. He initially blocked the door preventing her exit. When she asked him to move, he closed the door and turned off the lights. She repeatedly asked him to turn on the light and open the door but he refused. Finally, after talking with another Sailor on the victim's cell phone, the appellant turned on the light and opened the door allowing her to exit. She further indicated that upon exiting the head, she went straight to her room. Record at 221.

FN O indicates that she next saw the appellant at a club that night but didn't talk to or dance with him. The very next time the victim actually spoke to the appellant was a day later when she encountered him in the barracks laundry room. She testified that he invited her to come up to his room alone and watch a movie. She accepted. When asked why she accepted an invitation to go alone to the barracks room of a person who, according to her own testimony, she had only actually spoken to once before in the context of his trapping her against her will in a dark barracks room head, she indicated that she just "didn't have nothing else to do." *Id.* at 225.

Once in the room, the victim acknowledged looking through the appellant's pornographic magazine. She testified that she commented to the appellant that it was "sick" but that she nonetheless continued to look through the magazine for up to five minutes. *Id.* at 228. The two then watched one movie and part of another. The victim was lying on the end of the bed and the appellant was in a chair. At one point, two other Sailors stopped by the room. The victim opened the door, one of them picked up a CD and then they left.

During the second movie, the appellant climbed onto the bed behind the victim. Shortly thereafter, the victim testified that she felt the appellant touching her back through her shirt. She indicated that she pushed his hand away but kept watching the movie. According to the victim, the appellant and she then started wrestling around trying to gain control of a Popsicle stick. During this, the victim testified that the appellant began kissing her on the neck. *Id.* at 237. At this point, according to the victim, she was flat on her back on the bed and the appellant was lying on top of her.

The victim testified that she told the appellant that she couldn't do this because she had a boyfriend. She asked if the appellant had a girlfriend and he acknowledged that he did. The victim stated that he was "trifling" which she defined as meaning his conduct was "dirty" and "wrong." *Id.* at 238. According to the victim, the appellant eventually gained control of the popsicle stick and stood up in

triumph. The victim testified that at this point she "chuckled" and pointed out to him that she still had bits of the stick in her mouth. *Id.* at 296. The appellant, according to the victim, again pinned her down and tried to remove the bits of stick with his "hand and his mouth." *Id.* at 239. The victim testified that he held her head and was "kissing on me and stuff." *Id.* at 239. She claimed that she was pushing him away and telling him to "stop" and "quit." *Id.* at 241.

The victim testified that he finally got off her for the second time and left her alone for about a minute. She indicated that she sat on the end of the bed again and apparently went back to watching the movie. She testified that shortly thereafter she heard what she thought was a uniform belt buckle being undone behind her. The victim testified that she "didn't think anything" and "didn't look back or anything to see what he was doing." *Id.* at 242. Having been locked in a dark head with the appellant; having the appellant during the preceding moments twice pin her down on her back against her will; and having him repeatedly kiss her neck and mouth over her claimed loud protestations and pushing on both occasions; her claimed reaction is wholly nonsensical and inconsistent with a reasonable person's knowledge of life and the ways of the world. Simply put, her reaction at this point defies common sense. She testified that she did not find him "creepy" or "out of control." *Id.* at 287.

The victim went on to testify that she now heard clothes dropping to the floor behind her. Her testimony was that she thought "maybe he was digging through some clothes." *Id.* at 242. The appellant then, according to the victim, sat behind her in such a way that she was sitting between his extended naked legs on either side of her. Her testimony was that she thought "maybe he had put on some shorts." *Id.* at 243. She testified that she still did not look behind her. At this point, the victim testified that the appellant took her hand and pulled it behind her back to touch his penis. She testified that her response was to say, "[t]hat's nasty." *Id.*

It is only at this point that the victim claims she finally attempted to leave the room. Her description of the rape is as unpersuasive as that which came before. She began her description of events by noting that he was simultaneously pulling at the drawstring of her sweat pants and forcibly placing her knees on his shoulders. Somehow from having her knees on his shoulders, he was able to remove both her sweat pants and her underwear.

Beyond the incredible nature of the victim's description of events leading up to the rape, her description of the rape itself is unpersuasive and inconsistent with the testimony of the health care provider who testified that she observed no bruising to the victim's body and no trauma to her vagina. The victim testified that the appellant's initial penetration felt "like a hot poker." *Id.* at 246. She claimed to be fighting with the appellant, pushing on his pelvis and stomach, as they fought. She further testified that she was bent over the wooden end of the bed with her head on the rug, her buttocks on the mattress, and her back pressed down painfully against the wooden foot of the bed. *Id.* at 248. She testified that the appellant flipped her back and forth and entered her several times. *Id.* at 248–50. She testified that at various times the wooden part of the bed was "pinching [her] stomach," "pinching into [her] back," and that it hurt "pretty bad" when he penetrated her "too many times." *Id.* at 251–52.

Article 66(c), UCMJ only permits this court to affirm approved findings of guilty that it finds are correct in law and fact and *should* be approved. In considering the record, we may "weigh the evidence, judge the credibility of witnesses and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses." Understanding that I did not see FN O testify, I nonetheless find her testimony to be sufficiently incredible and contrary to my own experience and knowledge of the ways of the world that I have a reasonable doubt regarding the appellant's guilt. Given my concern with the factual record, I would set aside the findings and sentence and dismiss the charge.

Judge KELLY joins with Senior Judge GEISER.