# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 40363**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Samuel A. DOROTEO**
Senior Airman (E-4), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 7 February 2025[1]

––––––––––––––––––

*Military Judge*: Sterling C. Pendleton.

*Sentence*: Sentence adjudged 26 May 2022 by GCM convened at Ramstein Air Base, Germany. Sentence entered by military judge on 23 June 2022: Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant*: Major Megan R. Crouch, USAF; Major Frederick J. Johnson, USAF; Major Eshawn R. Rawlley, USAF; Scott R. Hockenberry, Esquire; Bradley W. Simon, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DOUGLAS, and MASON, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Judge DOUGLAS and Judge MASON joined.

––––––––––––––––––

––––––––––––––––––

[1] The court heard oral argument in this case on 18 June 2024 in its courtroom on Joint Base Andrews – Naval Air Facility Washington, Maryland.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of two specifications of sexual assault and three specifications of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2,3] The court members sentenced Appellant to a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence.

Appellant initially raised 11 issues on appeal, which we have rephrased: (1) whether the military judge erred by denying the Defense's request for an instruction on mistake of fact as to consent with respect to Specifications 4 and 5 of Charge I; (2) whether the military judge erred by instructing the court members they could consider evidence regarding the charged misconduct in Specifications 1 through 5 of Charge I as evidence of a common plan or scheme pursuant to Military Rule of Evidence (Mil. R. Evid.) 404(b), and allowing trial counsel to argue the same; (3) whether the evidence supporting Specifications 4 and 5 of Charge I was legally and factually sufficient; (4) whether Specifications 4 and 5 of Charge I should be dismissed for a government discovery violation; (5) whether Specifications 4 and 5 of Charge I should be dismissed because the Government knew or should have known the named victim provided false or misleading testimony; (6) whether the military judge erred by admitting a text message sent by a named victim under the excited utterance exception to the hearsay rule; (7) whether the evidence supporting Specification 9 of Charge I is legally and factually sufficient; (8) whether the evidence supporting Specification 6 of Charge I is legally and factually sufficient; (9) whether Appellant was denied effective assistance of counsel when trial defense counsel failed to make use of a named victim's pretrial statement which was irreconcilable with her testimony; (10) whether trial counsel's argument constituted

———————————

[2] Unless otherwise indicated, all references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] The court-martial found Appellant guilty of one of the specifications of sexual assault by exceptions and substitutions. The court-martial found Appellant not guilty of two specifications of sexual assault and two specifications of abusive sexual contact in violation of Article 120, UCMJ, and one specification of attempted abusive sexual contact in violation of Article 80, UCMJ, 10 U.S.C. § 880.

prosecutorial misconduct; and (11) whether Appellant was deprived of a constitutional right to a unanimous verdict. This court subsequently permitted Appellant to raise two additional issues: (12) whether all Appellant's convictions should be set aside due to government discovery violations; and (13) whether Appellant was denied effective assistance of counsel when trial defense counsel failed to move to compel production of a pretrial statement by a named victim or seek remedies pursuant to Rule for Courts-Martial (R.C.M.) 914.[4]

On 20 December 2024, this court issued its original opinion in this case. *United States v. Doroteo*, No. ACM 40363, 2024 CCA LEXIS 539 (A.F. Ct. Crim. App. 20 Dec. 2024) (unpub. op.). We set aside the findings of guilty and the sentence, dismissed the affected charge and specifications, and authorized a rehearing. On 6 February 2025, this court *sua sponte* reconsidered and vacated its original opinion. After reconsideration, we issue this opinion modifying the decretal paragraph. For the reasons stated below, we set aside the findings of guilty and the sentence and authorize a rehearing.

# I. BACKGROUND[5]

## A. KB

In October 2019, Appellant transferred to Ramstein Air Base (AB), Germany. There he became part of a friend group that eventually included KB,[6] Staff Sergeant (SSgt) MB, and Senior Airman (SrA) BB, among others. One night in October 2019, KB was sitting on her bed and watching television with Appellant and SrA BB and drinking wine. After a period of time, SrA BB left. At trial, KB testified she lay down on her bed because she was tired. Appellant then got on top of her and said he "just want[ed] to put the tip in," meaning he "wanted to have sex with [her]." KB testified she told Appellant she did not

---

[4] We note the court is releasing this opinion more than 18 months after Appellant's case was docketed, exceeding the threshold our superior court established for a facially unreasonable post-trial delay. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). We further note several factors contributed to this delay, including but not limited to 11 defense motions for an extension of time to file the initial assignment of errors; oral argument held at the request of the Defense; two separate supplemental briefs filed by the Defense, most recently in July 2024; and the unusual size and complexity of the trial and appellate records. Because we set aside the findings of guilty and the sentence on other grounds, we do not further analyze whether Appellant is entitled to relief for appellate delay.

[5] The following background with respect to KB, AN, and RY is based primarily on the testimony of the witnesses at trial.

[6] KB was an active duty Air Force member at all times relevant to this opinion.

want to have sex with him, but Appellant "ended up having sex with [her] and put[ ] his penis into [her] vagina." KB testified she told SrA BB about this incident but did not report it to law enforcement at that time.

After this incident, KB and Appellant remained part of the same friend group. KB and Appellant moved into an off-base house together with SSgt MB and SrA BB. One night in January 2020, the four of them were drinking alcohol and socializing at their house. KB became emotional and began crying in a bathroom. SrA BB took KB to the attic, where KB shared a sleeping area with SSgt MB. At that point, SSgt MB was already in the attic, asleep. According to SrA BB's testimony, as SrA BB was getting KB to lie down, Appellant came to the attic and repeatedly told SrA BB to go downstairs. SrA BB eventually complied and went to her bedroom on the floor below. KB testified that after SrA BB left, Appellant was in the attic "trying to comfort her" and touching her shoulder as she continued to cry. Appellant then got on top of KB and asked her to "[l]et [him] put the tip in again." KB testified she did not want to have sex with Appellant, but she could not remember if she said anything to him. KB then "remember[ed] [Appellant] actually having sex with [her]" with his "penis in [her] vagina," which made her feel "disgusted." Appellant eventually stopped and left the attic. SSgt MB remained asleep throughout this incident. KB testified she later told SSgt MB and SrA BB about what Appellant had done, but she did not report the incident to law enforcement at that time. Appellant and KB continued to remain part of the same friend group.

One night in March 2020, KB "went out to Kaiserslautern to drink and have fun" with a group of friends that included Appellant, SSgt MB, SrA BB, and others. Afterward, KB, Appellant, SSgt MB, SrA BB, and another Airman went to KB's on-base dormitory room.[7] SrA BB and the other Airman departed the room; SSgt MB and KB lay down on KB's bed to sleep; and Appellant was to sleep on KB's floor because he was too intoxicated to drive home. SSgt MB, lying closest to the wall, soon fell asleep. KB testified Appellant pulled her off the bed onto the floor and got on top of her. KB felt Appellant put his hand on her "inner thigh" and also felt "his penis on [her] thigh." KB testified: "I remember telling [Appellant], 'I don't want to have sex with you.' And I felt a little more persistent on that. And after that, he listened and got off of me and I went back to bed." KB then fell asleep. KB denied kissing, flirting, or giving Appellant any indication she wanted to have sex with Appellant that night. KB testified that after this incident, she "barely" saw or "hung out" with Appellant.

---

[7] Although KB had moved into an off-base house, she retained a dormitory room on Ramstein AB.

**B. AN**

AN[8] became friends with Appellant when they were both in technical school for security forces. AN was already stationed in Germany when Appellant arrived there in October 2019, when they resumed their friendship.

In April 2020, a mutual acquaintance of AN and Appellant, Airman First Class (A1C) OR, was selected to retrain for another career field. On 27 April 2020, A1C OR called AN to ask if he could come to her off-base residence to celebrate. AN agreed, and A1C OR arrived at approximately 2130 or 2200. Initially, AN and A1C OR drank alcohol and played trivia games together. However, AN later testified A1C OR began "calling [her] names and being like hateful toward [her]," which made AN uncomfortable. AN contacted Appellant and asked him to come to her residence because she did not want to be alone with A1C OR.

Appellant did go to AN's residence and joined AN and A1C OR in drinking alcohol and playing trivia. However, as A1C OR became more intoxicated he continued insulting AN, began stumbling when he walked, broke items in AN's bathroom, and tried to urinate in other parts of her house. AN and Appellant unsuccessfully tried to get A1C OR to go to sleep or leave the residence, resulting in A1C OR fighting with Appellant and slapping AN's face. AN and Appellant then called security forces, who arrived at AN's residence with German civilian police (Polizei). Security forces apprehended A1C OR and obtained statements from AN and Appellant.

One of the responding security forces members, Master Sergeant (MSgt) PB, testified at Appellant's trial. MSgt PB questioned AN and Appellant together after the Polizei questioned them. He noted AN had bruising on her cheek, minor cuts on her wrist and hand, and glass stuck in her leg. MSgt PB also noticed that while Appellant seemed "very physically stiff" and "did not move," AN seemed "very comfortable with [Appellant]," "grabb[ing] [Appellant's] left hand with her right hand" and "touch[ing] his arm in an up and down motion." According to MSgt PB, AN referred to Appellant as "the hero" multiple times.[9] After MSgt PB questioned AN and Appellant, he had them make written statements. However, based on their demeanor and the content and form of their written statements, MSgt PB "deemed" AN and Appellant "too intoxicated to make coherent statements." MSgt PB testified that although the written statements "go[ ] in with [his] daily paperwork," he did not "accept" them "as part of [his] overall casework."

---

[8] AN was an active duty Air Force member at all times relevant to this opinion.

[9] On cross-examination, AN denied she held Appellant's hand, stroked his arm, or called him a "hero."

AN testified that after security forces departed from the scene taking A1C OR with them, she offered to let Appellant sleep at her residence. AN offered to let Appellant sleep on her bed because her couch was not comfortable. When AN and Appellant lay on the bed, they talked about what had happened that night and engaged in some consensual kissing. However, when Appellant got on top of AN and "started to put his hand underneath [her] shirt," AN told him "no" and "to stop" while she "kept pushing him off." AN testified Appellant did touch her breast "the first time," but as he kept "trying to grab [her] breast" she "kept moving his hands away." Appellant then attempted to remove AN's shorts as AN struggled against him and told him to stop. AN testified Appellant was able to pull her shorts down and her underwear to the side, and he penetrated her vagina with his penis. AN estimated Appellant continued penetrating her for two or three minutes as she cried. When Appellant got off of AN, she told him to leave, and Appellant left her bedroom.

AN then sent a text message to another acquaintance, Technical Sergeant (TSgt) MS, asking him to come to her residence. TSgt MS arrived shortly thereafter and AN told him what had occurred. TSgt MS reported the incident to security forces and, later that day, drove AN to the Air Force Office of Special Investigations (OSI). AN subsequently underwent a sexual assault forensic examination at Landstuhl Regional Medical Center. DNA on swabs identified as coming from AN's genital area matched Appellant's DNA profile; swabs later taken from Appellant's pubic area identified DNA consistent with AN.

## C. RY

In August 2020, SrA CS attended a party at Appellant's house with her coworker and friend, RY.[10] At trial, SrA CS testified that at one point during the party she and RY were seated across a table from each other when Appellant sat down next to RY and began speaking with her. SrA CS did not initially pay attention to their conversation, but as Appellant talked SrA CS noticed RY became tense and "scoot[ed] farther back in her chair" away from Appellant. SrA CS "could tell [RY] was uncomfortable" and therefore she began paying closer attention to RY and Appellant. SrA CS testified that when Appellant got up to leave he "brush[ed]" RY's breast, then "hover[ed]" over RY's right shoulder before walking away. Describing the contact between Appellant's hand and RY's breast, SrA CS testified, "[I]t looked like he scooped her breast," and she made a "cupping motion" with her hand to demonstrate. SrA CS testified she did not know if Appellant lost his balance when he got up, or what if anything Appellant said to RY afterward, but SrA CS did not believe the contact was

---

[10] RY was an active duty Air Force member at all times relevant to this opinion.

accidental. According to SrA CS, RY did not "snap or confront" Appellant after he touched her, but RY appeared "very closed off" afterward.

RY did not testify during trial on the merits. The Government did introduce a series of text messages between RY and SrA TS, who was RY's designated driver for the night, in which RY asked him for a ride from the party back to the base. In the messages, RY stated she was "furious" and that "Sam"—evidently referring to Appellant—was the cause of her anger.

### D. Court-Martial Findings

With regard to KB, the court-martial found Appellant guilty by exceptions and substitutions of one specification of sexual assault on or about 31 January 2020 by penetrating KB's vulva with his penis without her consent in violation of Article 120, UCMJ (the attic incident). The court-martial also found Appellant guilty of abusive sexual contact by touching KB's "groin" with his penis between on or about 1 February 2020 and on or about 31 March 2020 in violation of Article 120, UCMJ (the second incident in KB's dormitory room). The court-martial did not find Appellant guilty of sexual assault on KB in October 2019 (the first incident in KB's dormitory room).[11]

With regard to AN, the court-martial found Appellant guilty of sexual assault on AN by penetrating her vulva with his penis without her consent, and guilty of abusive sexual contact by touching AN's breasts with his hand with an intent to gratify his sexual desire and without her consent, both offenses occurring on or about 26 April 2020 and both in violation of Article 120, UCMJ.

With regard to RY, the court-martial found Appellant guilty of abusive sexual contact by touching RY's breast with his hand with an intent to abuse, humiliate, harass, or degrade her, without her consent, in violation of Article 120, UCMJ.

The court-martial found Appellant not guilty of five specifications involving two other alleged victims, EV and LD: two specifications of sexual assault and two specifications of abusive sexual contact in violation of Article 120, UCMJ, and one specification of attempted abusive sexual contact in violation of Article 80, UCMJ.

---

[11] Specification 4 of Charge I alleged Appellant penetrated KB's vulva with his penis on divers occasions between on or about 12 October 2019 and on or about 31 January 2020. The court members found Appellant guilty by excepting the words "on divers occasions, between on or about 12 October 2019 and on or about 31 January 2020," and substituting therefore "on or about 31 January 2020."

## II. DISCUSSION

### A. Discovery

Appellant raises two assignments of error alleging prejudicial discovery violations, identified above as issues (4) and (12). Issue (4) addresses whether Specifications 4 and 5 of Charge I—the convictions related to KB—should be set aside based on a post-trial disclosure in March 2023 by one of the assistant trial counsel from an interview with KB in November 2021. Issue (12) addresses whether all of Appellant's convictions should be set aside due to additional and much more extensive government post-trial disclosures in June 2024 which, Appellant asserts, prejudiced him with respect to every finding of guilty. We have consolidated issues (4) and (12) for purposes of our analysis below.

#### 1. Additional Background

Appellant's arraignment occurred on 16 August 2021. This was followed by motions hearings on 16–17 November 2021 and 10–13 January 2022 and trial on 16–26 May 2022. At trial, Appellant pleaded not guilty to all charges and specifications, and the Defense contested the reliability of the testimony of KB, AN, and SrA CS (the witness to the charged abusive sexual contact on RY). Appellant was sentenced and his court-martial concluded on 26 May 2022. The military judge entered the judgment of the court-martial on 23 June 2022.

Captain (Capt) ST was detailed as an assistant trial counsel for Appellant's court-martial on 3 September 2021, but he subsequently withdrew from the case on 7 December 2021. On 22 March 2023, nearly ten months after Appellant was sentenced, Capt ST signed a memorandum for record describing certain events relating to his involvement in Appellant's court-martial. In pertinent part, Capt ST stated that on 6 November 2021 he participated in an interview with KB to prepare for the November 2021 motions hearings. Capt ST stated that in October 2022, months after the court-martial concluded, he "discovered" his notes of that interview indicated KB "first told Trial Counsel words to the effect that she had never kissed [Appellant], but later in the same interview conceded that maybe she had kissed him once during a night of drinking in a club in Germany in approximately October 2019." Capt ST stated that, at the time, he mistakenly believed this incident was the same one described in an earlier defense motion; therefore, he believed the Defense was already in possession of the information KB disclosed during the 6 November 2021 interview about possibly having kissed Appellant. Capt ST stated that "[a]fter recognizing this error in October 2022, [he] reviewed the court-martial transcript," and "[b]ased upon that review, [he] did not believe that admission was ever shared with Defense Counsel or elicited at trial."

Based upon this disclosure, appellate defense counsel requested and obtained a copy of Capt ST's typed notes of the 6 November 2021 interview with KB. These notes reflect KB initially denied kissing Appellant, but on repeated questioning she said she believed she might have kissed Appellant at a club in October 2019. These notes also indicated KB had twice kissed another female Airman, SrA AV, and engaged with her in "touching" that was "below the waist" but "over the clothing" and without penetration. SrA AV later dated Appellant; she testified at trial as a defense witness.

Appellant's initial assignments of error, submitted on 15 December 2023, included that Appellant's convictions involving KB "should be dismissed for the Government's discovery violations which were revealed via a post-trial *Brady*[12] disclosure from trial counsel," citing Capt ST's post-trial disclosure and interview notes. The Government submitted its answer to the assignments of error on 4 March 2024, and Appellant submitted a reply brief on 27 March 2024.

On 7 June 2024, Major (Maj) JB, the Chief of Military Justice at Ramstein AB, sent appellate defense counsel an email with additional post-trial disclosures. The email read, in part:

> [T]he Government does not concede the Defense has met the *Campbell* factors[13] in this case and is making these post-trial disclosures under our continuing obligations as the Government. . . . I was completely unfamiliar with this case when you brought it to my attention and despite my best efforts, I was unable to discuss this case with all trial counsel as I originally wanted. Going through the information we have, we have compiled the following post-trial disclosures.

Maj JB's email then identified dozens of individual disclosures drawn from trial counsel interview notes related to various witnesses, categorized according to the charged victim (KB, AN, and RY, as well as EV and LD) or as relating to Appellant himself.[14] This court granted the Defense's motion to attach Maj JB's email to the record, as well as approximately 300 pages of post-trial discovery the Government provided to the Defense consisting of typed and

---

[12] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[13] *United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002).

[14] Most of the disclosures relate to either KB (approximately 20 disclosures) or EV (approximately 22 disclosures), with relatively fewer relating to RY (six), Appellant (four), AN (three), and LD (two). The amount of information within each disclosure varies from single statements to small paragraphs.

handwritten interview notes from trial counsel interviews with over 30 witnesses, with an index.

This court also permitted the Defense to attach a declaration dated 16 June 2024 from Maj CM, one of Appellant's trial defense counsel, identifying and providing copies of eight pretrial disclosures the Government had delivered to the Defense before Appellant's trial based on witness interviews. In light of these disclosures, this court further permitted the Defense to file a supplemental assignment of error calling for all of Appellant's convictions to be set aside due to government discovery violations.[15]

**2. Law**

"Discovery in military practice is open, broad, liberal, and generous." *United States v. Guthrie*, 53 M.J. 103, 105 (C.A.A.F. 2000) (citations omitted). In reviewing discovery matters, we conduct a two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on [Appellant's] trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (quoting *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004)). The appellant "bears the burden of proving that the Government withheld discoverable evidence." *Guthrie*, 53 M.J. at 105 (citations omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Under *Brady*, evidence is material if there is a 'reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Smith v. Cain*, 565 U.S. 73, 73 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)); *see also United States v. Behenna*, 71 M.J. 228, 237–38 (C.A.A.F. 2012) (quoting *Smith*).

---

[15] Neither party has objected to this court's consideration of the documents related to post-trial discovery the parties have moved this court to attach to the record, despite these matters being outside the "entire record." *See United States v. Jessie*, 79 M.J. 437, 440–44 (C.A.A.F. 2020). We note our superior court has previously held "some measure of appellate inquiry [may be] warranted" when a Court of Criminal Appeals is "faced with a post-trial dispute over discovery relevant to an appeal." *Campbell*, 57 M.J. at 138 (citation omitted). Moreover, *Campbell* itself involved post-trial allegations of unlawful influence and prosecutorial misconduct that were raised only after the convening authority took action. *Id.* at 135. In light of *Campbell* and the absence of any objection, we conclude we may consider these matters. *See United States v. Stanton*, 80 M.J. 415, 417 n.2 (C.A.A.F. 2021) (considering documents not included in or attached to the record of trial "because neither party has objected to [the court's] consideration of them"); *Campbell*, 57 M.J. at 138.

The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule."); *United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (applying *Strickler*). Put another way, "[e]vidence is favorable if it is exculpatory, substantive evidence or evidence capable of impeaching the government's case." *Behenna*, 71 M.J. at 238 (citations omitted). "[T]he state's obligation under [*Brady*], to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government . . . ." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). "Once a *Brady* violation is established, courts need not test for harmlessness." *Behenna*, 71 M.J. at 238 (citing *Kyles*, 514 U.S. at 435–36).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ, 10 U.S.C. § 846 [ ], as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). Article 46, UCMJ, and these implementing rules provide a military accused statutory discovery rights greater than those afforded by the United States Constitution. *See id.* at 187 (citing *Roberts*, 59 M.J. at 327) (additional citation omitted). R.C.M. 701(a)(6) provides that trial counsel

> shall, as soon as practicable, disclose to the defense the existence of evidence known to trial counsel which reasonably tends to— (A) Negate the guilt of the accused for an offense charged; (B) Reduce the degree of guilt of the accused of an offense charged; (C) Reduce the punishment; or (D) Adversely affect the credibility of any prosecution witness or evidence.

"[T]rial counsel must review their own case files and must also exercise due diligence and good faith in learning about any evidence favorable to the defense 'known to the others acting on the [G]overnment's behalf in the case, including the police.'" *United States v. Stellato*, 74 M.J. 473, 486 (C.A.A.F. 2015) (quoting *United States v. Williams*, 50 M.J. 436, 441 (C.A.A.F. 1999) (additional citation omitted)).

"As a general matter, when an appellant has demonstrated error with respect to nondisclosure, the appellant will be entitled to relief only if there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed." *United States v. Jackson*, 59 M.J. 330, 334 (C.A.A.F. 2004). "In military practice, '[w]here an appellant demonstrates that the Government failed to disclose discoverable evidence in response to a specific request or as a result of prosecutorial misconduct, the appellant will be

entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt.'" *Claxton*, 76 M.J. at 359 (alteration in original) (citing *Roberts*, 59 M.J. at 327 (citation omitted)). "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Coleman*, 72 M.J. at 187 (citation omitted).

### 3. Analysis

Appellant identifies numerous disclosures by Maj JB, as well as other material in the attached interview notes not specifically identified by Maj JB, with respect to all five of the named victims, as being wrongfully withheld from the Defense before Appellant's trial. Appellant further contends the "harmless beyond a reasonable doubt" standard applies because the withholding constituted prosecutorial misconduct and because the Defense made specific requests for information trial counsel failed to disclose. The Defense concludes the alleged discovery violations were not harmless beyond a reasonable doubt and fatally undermine Appellant's convictions related to KB, AN, and RY.

In response, the Government denies "discovery violation[s] warranting dismissal of Appellant's convictions." To begin, it argues "much of the current disclosures is duplicative of information already known to the [D]efense," and "[s]till other disclosures involve witnesses telling [g]overnment trial counsel about their interviews with Appellant's [trial] defense counsel, which again, is information previously known to the Defense." The Government notes Maj CM's 16 June 2024 declaration, identifying the pretrial disclosures trial counsel did make to the Defense, did not comment on whether trial defense counsel were otherwise aware of the undisclosed information before trial, nor did Maj CM address how the undisclosed information would have influenced the Defense's preparation or strategy. The Government contends, "assum[ing] Appellant's trial defense counsel were unaware of the disclosures [ ] which Appellant cites in his supplemental brief, Appellant has failed to show how the disclosures were material to his case or how he was prejudiced by their nondisclosure."

We conclude Appellant has demonstrated prejudicial errors affecting the findings of guilty with respect to KB and RY (Specifications 4, 5, and 9 of Charge I). It is not practical or necessary to discuss every alleged discovery violation, but we address the most significant points below.

#### a. KB

##### i) KB's statement she likely did kiss Appellant in October 2019

Capt ST's notes from the 6 November 2021 interview with KB indicate trial counsel asked KB if she was flirtatious with or kissed Appellant. KB responded "no," and said "[h]er interactions with [Appellant were] not any different than

interactions with other people." Trial counsel again asked KB if she ever kissed Appellant, and after a "long pause" she again said "no." Trial counsel asked again, and this time KB responded, "[M]aybe like in the beginning where we [were] just like getting to know each other . . . ." She reiterated they "[k]issed at the beginning when getting to know each other." KB stated this happened "[o]nce maybe" at "the club in Germany" on "probably the first day [they] ever met" in October 2019.

KB was the only eyewitness (other than Appellant) to the January 2020 sexual assault and March 2020 abusive sexual contact, as well as the charged October 2019 sexual assault of which Appellant was acquitted. In her testimony, KB denied finding Appellant attractive or having an "intimate relationship" with him. On cross-examination, she testified she did not remember kissing Appellant on specific occasions in October and December 2019 in the presence of others; in context, trial defense counsel appear to have been asking about different occasions than the one described in her 6 November 2021 interview with trial counsel at a club on the first day they met.

In this context, KB's undisclosed statement that she likely did voluntarily kiss Appellant in October 2019 was material and favorable to the Defense with respect to countering KB's testimony. The fact that during the interview KB evidently repeatedly denied to trial counsel kissing Appellant before reluctantly admitting that she probably did so—*i.e.*, that she changed her statement—was significant. In addition, this admission tended to undermine the impression given by her testimony at trial that KB had not kissed Appellant and did not find him attractive.

### *ii) KB's statement she engaged in "touching" with SrA AV*

Capt ST's notes from the 6 November 2021 interview reflect KB told trial counsel she had kissed SrA AV approximately twice while they were drinking alcohol. When trial counsel asked KB whether more than kissing happened, KB initially said "no." However, when trial counsel readdressed the point, KB told them she and SrA AV "did a little more than making out but it was nothing penetration wise. More touching. But nothing too crazy." When trial counsel asked whether the touching was over or under the clothing, KB told them she "believe[d] it was over the clothing" and "[b]elow the waist," including "[p]rivate areas."

Declarations to this court from Maj CC and Maj CM, Appellant's trial defense counsel, indicate they were unaware of these statements by KB. According to them, these statements would have been significant both because KB "changed her story" within the interview itself, and because KB's statements were contradicted by information from other witnesses that KB and SrA AV engaged in more extensive sexual activity than KB described. Maj CC and

Maj CM stated that if they had known about KB's statements, it would have influenced their trial strategy and preparation.

At trial, KB was not questioned about her relationship with SrA AV. SrA AV was called as a defense witness and testified, *inter alia,* that she observed KB consensually kissing Appellant in December 2019, and that KB admitted to SrA AV the alleged October 2019 sexual assault by Appellant had been consensual; but SrA AV was not questioned about any sexual activity between herself and KB. SrA TP, who trial defense counsel identified as a potential witness to sexual activity between KB and SrA AV who would contradict KB's account of that relationship, was not called as a witness by either party. Evidence KB admitted to engaging in intimate activity with SrA AV, another female, also tended to support one of the defense theories as to why KB would deny or downplay any consensual relationship with Appellant—that KB held herself out as exclusively interested in and wanting to pursue relationships with females, not males.

### iii) KB's statement Appellant attempted to perform oral sex during the January 2020 incident

Trial counsel notes from an interview with KB dated 17 March 2021 indicate trial counsel asked KB if Appellant "[t]ried to perform oral sex" during the January 2020 incident in the attic. KB responded, "I do remember his face down in that area and trying to make contact and trying to perform the action. I didn't want that to be done to me." KB told trial counsel she did not know if Appellant's mouth, tongue, or other body part made contact with her "vagina" during this attempt.

The OSI report of investigation for Appellant's offenses against KB states that during a 6 November 2020 interview, KB told OSI agents Appellant "did not attempt to give her oral sex." Thus, KB's statements to trial counsel in March 2021 appear to contradict her statements to OSI in November 2020.

### iv) SSgt MB's statement as to SrA BB being romantically "obsessed" with KB

Trial counsel notes from a 12 October 2021 interview with SSgt MB indicate he told trial counsel SrA BB, the female housemate and friend of Appellant and KB, "had a crush on [KB]" and "was obsessed w[ith] [KB] and wanted to pursue a romantic interest in her."

SrA BB testified at trial as a prosecution witness and provided important testimony for the Government. As described above, SrA BB was present with KB and Appellant shortly before both the October 2019 and January 2020 incidents. SrA BB testified that after the October 2019 incident, KB told SrA BB that KB "never wanted to be left alone with [Appellant]." With regard to the January 2020 incident, SrA BB testified that after she took the intoxicated and

14

emotional KB to the attic to sleep, Appellant came to the attic and "kept telling [SrA BB] to go downstairs," until she complied. SrA BB further testified that KB later told her "what happened in the attic."

SSgt MB was also called as a prosecution witness. On direct examination, he provided testimony that was somewhat helpful to the Government, including *inter alia* that he was a heavy sleeper and describing the events leading up to the March 2020 dorm room incident until the point at which he fell asleep. On cross-examination, he provided testimony favorable to the Defense to the effect that, *inter alia*, he believed KB and Appellant had had a romantic relationship prior to March 2020. However, he was not questioned about SrA BB's feelings toward or relationship with KB.

### v) Analysis of disclosures with regard to KB

The reliability of KB's testimony was vitally important to the Government's ability to prove Appellant's guilt of the January 2020 sexual assault and the March 2020 abusive sexual contact. The Government had no physical evidence from these incidents, nor any incriminating admissions by Appellant. KB's testimony was the essential proof of the charged acts.

The reliability of KB's testimony was heavily attacked by the Defense. KB testified she did not remember consensually kissing Appellant in October or December 2019, and generally gave the impression she had no romantic or sexual interest in him. However, SrA BB and SrA AV both testified they witnessed KB consensually kissing Appellant in late 2019, and SSgt MB testified KB told him she had kissed Appellant. In addition, SSgt MB testified he believed— based on what KB had told him—KB and Appellant had a consensual romantic relationship prior to March 2020. The Defense's strongest evidence impeaching KB's testimony was directly related to the October 2019 incident, of which Appellant was acquitted. Specifically, SrA AV testified that during a conversation with KB in the fall of 2019, KB acknowledged her prior statements about the October 2019 incident with Appellant were not true, "that her sexual interaction with [Appellant] was consensual, but she didn't want people to know that she was having sex with him or had sex with him because she was supposed to be into females." In addition, SrA BB testified that KB told SrA BB that KB "let" Appellant have sex with her in October 2019 because KB "didn't want to disappoint" Appellant and wanted to "make him satisfied."

The court members found Appellant not guilty of the October 2019 incident, and under these circumstances the reliability of KB's testimony as to the January and March 2020 offenses may have rested on a knife's edge. Additional impeachment evidence relating either to KB's personal credibility or to the offenses of which Appellant was convicted may have tipped the balance. The belated government disclosures described above provide such material.

KB's reluctant admission to trial counsel that she believed she kissed Appellant in October 2019 was contrary to the gist, if not the letter, of her trial testimony, and if elicited on cross-examination would have materially supported the Defense's theory that Appellant and KB engaged in consensual sexual activity. Equally important, KB's reluctant admissions during the interview regarding kissing KB and kissing and touching SrA AV contradicted her prior denials of such behavior, and trial defense counsel could have used such inconsistent statements to attack her credibility. Coming from KB herself, her undisclosed admission and self-contradiction regarding an incident that was not explored at trial was not simply a repetition of different impeachment evidence the Defense elicited from other witnesses. Moreover, KB's statement to trial counsel that she remembered Appellant attempting to perform oral sex in January 2020 contradicted her prior statement to OSI that Appellant had not done so; significantly, this inconsistency specifically related to KB's account of the sexual assault of which Appellant was convicted. Finally, SSgt MB's statement to trial counsel that SrA BB was romantically "obsessed" with KB indicated potential bias on the part of a significant government witness who laid important foundations related to KB's testimony regarding the January 2020 offense.

For the foregoing reasons, we conclude the cumulative effect of the undisclosed information in the possession of trial counsel described above was impeachment evidence favorable to the Defense and sufficient to "'undermine[ ] confidence in the outcome of the trial,'" and therefore material to Appellant's guilt or evidence constitutionally required to be disclosed. *Behenna*, 71 M.J. at 238 (omission in original) (quoting *Smith*, 565 U.S. at 75). Accordingly, Appellant is entitled to relief.

In addition to being constitutionally required, these statements were "evidence known to trial counsel which reasonably tend[ed] to . . . [a]dversely affect the credibility of any prosecution witness or evidence," and therefore R.C.M. 701(a)(6) also required disclosure to the Defense. This raises the question of whether the ordinary harmless error standard or the heightened "harmless beyond a reasonable doubt" standard applies to the R.C.M. 701 violation. *See Coleman*, 72 M.J. at 187 (citations omitted). Appellant contends the latter standard applies, both due to the existence of prosecutorial misconduct and because the Defense made "specific requests that should have resulted in the disclosure of withheld evidence." Appellant points to pretrial defense requests for "summaries of conversations with representatives of the [G]overnment," "[a]ny evidence tending to diminish the credibility of any potential witness," and "notification regarding communications with complaining witnesses." We are not persuaded these broad requests for general categories of information amount to "specific" requests for information to which the Defense was entitled. As for prosecutorial misconduct, Appellant asserts that the nondisclosure

itself constituted prosecutorial misconduct. We recognize the concept of "prosecutorial misconduct" is broad. *See United States v. Andrews*, 77 M.J. 393, 402 (C.A.A.F. 2018) ("Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). However, in the context of discovery obligations, it cannot be so broad as to encompass every violation of R.C.M. 701(a)(6); otherwise, the two-tiered prejudice test for discovery violations our superior court has set forth would have only one tier. *See Coleman*, 72 M.J. at 187 (citations omitted). Nevertheless, assuming for purposes of analysis that the heightened prejudice standard does not apply, for reasons similar to those set forth above with respect to the materiality of the withheld information, we find "there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed." *Jackson*, 59 M.J. at 334; *see also United States v. Mahoney*, 58 M.J. 346, 349 (C.A.A.F. 2003) ("[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (quoting *Kyles*, 514 U.S. at 434) (additional citation omitted)).

Accordingly, under *Brady*, *Bagley*, and *Behenna*, as well as R.C.M. 701(a)(6), we find prejudicial error with respect to the findings of guilty as to Specifications 4 and 5 of Charge I.

### b. RY

#### i) SrA CS's statements regarding her pre-existing bias against Appellant

Trial counsel notes from a 19 November 2021 interview with SrA CS indicate she provided *inter alia* the following information. When trial counsel asked SrA CS why she thought Appellant touched RY's breast intentionally, she responded that she "could tell [Appellant] was hitting on [RY]," but "[t]his [wa]s more opinion than factual info." SrA CS had met Appellant before at another party and "got bad vibes" from him. SrA CS "never got good vibes" from Appellant and "[n]ever wanted to be his friend." She later stated, "[I]n retrospect it seems in his character to do that on purpose." Still later she continued in the same vein: "I always got bad vibes from him. . . . I am good about sending [sic] those things." Additionally, "[SrA CS] got bad vibes from [Appellant] that first time she met [him]. That friend group loved [Appellant] but [SrA CS] immediately got bad vibes. There wasn't any reason why, she just did."

SrA CS was the only eyewitness to testify regarding Appellant touching RY's breast. The Government also introduced the testimony of SrA TS, who observed RY's demeanor as he drove her back to Ramstein AB after the party,

and of a text exchange between RY and SrA TS to the effect that RY was "furious" at Appellant. However, RY herself did not testify during the findings phase, and the Government offered no incriminating statements by Appellant, physical evidence, or photographic or video evidence of the offense.

### ii) SrA CS's statement regarding communication with Appellant's girlfriend

During the same interview, SrA CS told trial counsel about a different incident involving Appellant and KB at which SrA CS was present. Evidently, this was a different incident from any of the charged offenses involving KB. In short, according to SrA CS, during a party, on some occasion, Appellant was in a locked room with KB. When several individuals pounded on the door, Appellant "storm[ed] past them" denying he knew where KB was, but KB was on the floor of the room crying. Appellant got into a loud confrontation with SrA BB, SrA CS, and other individuals about his behavior. SrA CS then told trial counsel SrA CS contacted Appellant's then-girlfriend via a video call "to tell her about the [KB] situation."

### iii) Analysis of disclosures with regard to RY

The Government's nondisclosures with respect to RY are perhaps less extensive or dramatic than those involving KB, but they are nonetheless significant when viewed in the context of the entire case. RY herself did not testify during findings, and the Government offered no incriminating statements or physical or documentary evidence of the charged abusive sexual contact on RY; SrA CS's testimony provided the only description of the offense. Accordingly, her testimony was essential to the Government's case, and its reliability was vitally important.

The trial counsel interview notes indicate the Government failed to disclose significant impeachment evidence with respect to SrA CS. One of the factual questions for the court members to decide was whether Appellant touched RY's breast with the intent to abuse, humiliate, harass, or degrade her, or whether it was possible he touched her accidentally as he stood up next to her. SrA CS admitted her belief the contact was not accidental was "more opinion than factual info." SrA CS then repeatedly indicated her interpretation of the incident was shaped by the "bad vibes" she had always gotten from Appellant from the first time she had met him, despite not having "any reason why." Although less obvious, SrA CS's statement that she confronted Appellant's then-girlfriend about supposed misbehavior with KB also evinced bias or hostility against Appellant. During cross-examination, trial defense counsel used SrA CS's statement to OSI and other pretrial statements to explore *inter alia* the possibility the contact was accidental, that SrA CS may have mistaken Appellant for someone else, that SrA CS had been less than entirely forthcoming with OSI,

and that she was "like a sister" to RY at the time; however, the undisclosed statements to trial counsel would have provided significant additional impeachment in that SrA CS admitted she was biased against Appellant, which shaped her interpretation of the incident.

We also consider the impact of the Government's failure to disclose in light of our conclusion below, that the military judge erred by admitting Prosecution Exhibit 11 (PE 11), RY's text exchange with SrA TS wherein she indicated Appellant had made her "furious." *Cf. United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) ("Under the cumulative-error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" (quoting *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A. 1992)). Although PE 11 was not as critical to the Government's case as SrA CS's testimony, it was important corroboration that Appellant had in fact done something offensive to RY. If PE 11 had been excluded, SrA CS's reliability would have been under greater pressure, increasing the significance of the Government withholding evidence of SrA CS's admitted bias against Appellant.

For the foregoing reasons, we find the undisclosed information from SrA CS in the possession of trial counsel described above, viewed in the context of the court-martial as a whole, was impeachment evidence favorable to the Defense and sufficient to "undermine[ ] confidence in the outcome of the trial," and therefore material to Appellant's guilt or evidence. *Behenna*, 71 M.J. at 238 (omission in original) (internal quotation marks and citations omitted). Accordingly, Appellant is entitled to relief with respect to Specification 9 of Charge I (abusive sexual contact of RY). *See Kyles*, 514 U.S. at 435. For similar reasons, we also conclude these statements were "evidence known to trial counsel which reasonably tend[ed] to . . . [a]dversely affect the credibility of any prosecution witness or evidence," and therefore required to be disclosed to the Defense under R.C.M. 701(a)(6). Applying the non-constitutional prejudice standard, and again viewing the error in the context of the entire case, we again find "a reasonable probability that there would have been a different result at trial if the evidence had been disclosed." *Jackson*, 59 M.J. at 334.

### c. Other Alleged Discovery Violations

We decline to address the undisclosed information from trial counsel interviews related to EV, LD, and Appellant himself because we find these nondisclosures do not significantly contribute to our analysis.

We are not persuaded that any of the failures to disclose information from trial counsel interviews related to AN resulted in material prejudice to Appellant. However, we find it unnecessary to analyze these nondisclosures because,

as described *infra*, we find the findings of guilty involving AN (Specifications 6 and 7 of Charge I) must be set aside on other grounds.

## B. Ineffective Assistance of Counsel (Specifications 6 and 7 of Charge I)

### 1. Additional Background

As described *supra*, AN testified regarding the events preceding the charged sexual assault and abusive sexual contact in April 2020 for which Appellant was convicted. AN described being in her residence with A1C OR, whose increasing intoxication and hostility prompted her to ask Appellant to come over. Eventually AN and Appellant called security forces, including MSgt PB, to remove A1C OR. AN testified that she was questioned by security forces and also provided them a written statement. MSgt PB's testimony confirmed he questioned AN and Appellant together and received a written statement from each of them.

The Defense did not receive a copy of AN's statement to security forces regarding A1C OR.[16] Trial defense counsel did not move to compel the Government to produce the statement after AN testified.

On appeal before this court, Appellant's second Additional Assignment of Error alleges Appellant was denied effective assistance of counsel when trial defense counsel failed to move to compel production of AN's April 2020 statement or seek remedies pursuant to R.C.M. 914.

In response, the Government obtained and moved to attach responsive affidavits from Appellant's trial defense counsel. Maj CC, the lead trial defense counsel, provided the most detailed response. He confirmed that before trial, the Defense was aware AN had prepared a written statement for MSgt PB which was not in the possession of the security forces records and analysis section and was presumed to have been lost or destroyed. Maj CC noted that on cross-examination of AN, the Defense emphasized the events leading up to A1C OR's removal from AN's residence. He explained:

> Although we expected AN to deny [being affectionate toward Appellant], we knew that MSgt PB would contradict her and support our claim that AN was or appeared to be attracted to our

---

[16] In preparing for trial, trial defense counsel learned that MSgt PB had collected and turned in AN's statement, but the security forces records and analysis section did not have it. As a result, the Defense moved to abate the proceedings with respect to Specifications 6 and 7 of Charge I. The military judge denied the motion, concluding the Defense had not shown the statement was essential to a fair trial or that adequate substitutes were not available. Appellant has not alleged error with respect to the military judge's denial of the Defense's motion to abate.

client. This would later allow us to argue AN was either lying about or forgetting critical events from that night. We would also use this line of inquiry to bolster our argument in support of our theories of consent or mistake of fact as to consent.

Maj CC further explained he was aware of R.C.M. 914 and *United States v. Muwwakkil*, 74 M.J. 187 (C.A.A.F. 2015), and he knew that after AN testified the Defense could request the Government produce AN's statement to MSgt PB. He knew the Government would be unable to comply, which would require the military judge to either order the court members "to disregard AN's testimony" or to declare a mistrial. Maj CC believed the military judge was unlikely to declare a mistrial or exclude AN's entire testimony, and likely would instead exclude only that portion of AN's testimony that covered the same subject matter as to the missing statement. This, he explained, would have been an undesirable result because AN's testimony about the charged offenses would still be in evidence, and because the Defense wanted AN's testimony about the night up to and including the arrival of security forces because they knew MSgt PB's testimony would contradict her testimony. Moreover, Maj CC contended the unavailability of AN's statement "in no way impacted" the Defense's "ability to cross-examine AN regarding the charged misconduct." Therefore, Maj CC explained, he made a "strategic decision" not to seek production of AN's statement. Maj MC's affidavit is generally consistent with Maj CC's; she described Maj CC explaining to Maj MC his reasoning for not moving for production of the statement under R.C.M. 914. Maj CM's affidavit states she did not recall a specific discussion about R.C.M. 914, but after considering the matter in hindsight, she believed she would have concurred with Maj CC's decision.

### 2. Law

The Sixth Amendment[17] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Palik*, 84 M.J. 284, 288 (C.A.A.F. 2024) (citing *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the

---

[17] U.S. CONST. amend. VI.

allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result? *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)) (additional citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). "Where . . . an appellant attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" *Id.* (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)).

With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted). "'When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion . . . . an appellant must show that there is a reasonable probability that such a motion would have been meritorious.'" *Palik*, 84 M.J. at 289 (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (additional citation omitted)).

At the time of Appellant's trial, R.C.M. 914 provided in pertinent part:

> (a) *Motion for production*. After a witness other than the accused has testified on direct examination, the military judge, on motion of a party who did not call the witness, shall order the party who called the witness to produce, for examination and use by the moving party, any statement of the witness that relates to the subject matter concerning which the witness has testified, and that is:

> (1) In the case of a witness called by trial counsel, in the possession of the United States . . . .

> . . . .

> (e) *Remedy for failure to produce statement*. If the other party elects not to comply with an order to deliver a statement to the moving party, the military judge shall order that the testimony of the witness be disregarded by the trier of fact and that the

trial proceed, or, if it is trial counsel who elects not to comply, shall declare a mistrial if required in the interest of justice.[18]

(f) *Definition.* As used in this rule, a "statement" of a witness means:

(1) A written statement made by the witness that is signed or otherwise adopted or approved by the witness . . . .

Thus,

At the trial level, if the government, as the opposing party, fails to produce a qualifying statement, R.C.M. 914(e) provides the military judge with [only] two remedies for the government's failure to deliver the qualifying statement: (1) "order that the testimony of the witness be disregarded by the trier of fact" or (2) "declare a mistrial if required in the interest of justice."

*Palik*, 84 M.J. at 290 (alteration in original) (quoting *United States v. Sigrah*, 82 M.J. 463, 467 (C.A.A.F. 2022)).

"Given the similarities in language and purpose between R.C.M. 914 and the Jencks Act, [918 U.S.C. § 3500,] this Court has 'conclud[ed] that our Jencks Act case law and that of the Supreme Court informs our analysis of R.C.M. 914 issues.'" *Id.* at 289–90 (quoting *Muwwakkil*, 74 M.J. at 191). "Jencks Act jurisprudence . . . recognizes a judicially created 'good faith loss doctrine' [which] excuses the Government's failure to produce 'statements' if the loss . . . of evidence was in good faith.'" *Id.* at 290 (quoting *Muwwakkil*, 74 M.J. at 193).

### 3. Analysis

Applying the three-prong analysis set forth in *Gooch*, we find Appellant did not receive effective assistance when trial defense counsel failed to move for production of AN's April 2020 statement to security forces after AN testified pursuant to R.C.M. 914. We address each prong below.

---

[18] We note R.C.M. 914(e) has subsequently been amended by the addition of a subsection (2), which provides:

*Exception.* In the event that the other party cannot comply with this rule because the statement is lost, and can prove, by a preponderance of evidence, that the loss of the witness statement was not attributable to bad faith or gross negligence, the military judge may exercise the sanctions set forth in paragraph (e)(1) of this rule only if—

(A) the statement is of such central importance to an issue that it is essential to a fair trial, and

(B) there is no adequate substitute for the statement.

### *a. Whether Appellant's Allegations are True, and if so, is there a Reasonable Explanation*

As an initial matter, we find Appellant's allegations are true. It is clear from MSgt PB that he received a written statement from AN. Trial defense counsel were aware AN provided a written statement to MSgt PB, which was apparently either lost or destroyed after MSgt PB delivered it to the security forces detachment. Trial defense counsel did not move for production or remedies under R.C.M. 914 after AN testified.

The Government suggests it is "questionable" as to whether AN's written statement for MSgt PB "was a statement at all" for purposes of R.C.M. 914. The Government notes MSgt PB testified that he "deemed" AN "too intoxicated to make [a] coherent statement[ ]," in part because "she missed key details" about the incident with A1C OR. However, we find the record indicates AN made a "written statement . . . that [wa]s signed or otherwise adopted or approved by the witness," satisfying the R.C.M. 914(f)(1) definition. Based on the testimony of AN and MSgt PB, AN may have been intoxicated to some degree, but she was able to speak with MSgt PB, understand his directions, and write a statement as requested. MSgt PB may have considered it incomplete or inadequate for his purposes, and he instructed her to go to security forces the following day to make an additional statement; but his dissatisfaction does not disqualify AN's original statement as a "statement" for purposes of the rule.

Next, we find trial defense counsel's explanations for failing to make such a motion are not reasonable. Based on their declarations, trial defense counsel did not doubt the substantive merit of a potential R.C.M. 914 motion; their disinclination to pursue such a course was due to what they perceived as the likely remedy from the military judge. For purposes of our analysis, we accept Maj CC's assessment that the military judge was unlikely to declare a mistrial. This was a plausible conclusion with respect to an issue affecting only the two specifications involving AN, where eight other specifications involving four other alleged victims were also before the court-martial.

Therefore, under R.C.M. 914 and *Muwwakkil*, the only alternative remedy available to the military judge would have been to "order that the testimony of the witness be disregarded by the trier of fact." Because AN was the only witness (other than Appellant) to the misconduct alleged in Specifications 6 and 7 of Charge I, an order to disregard all of AN's testimony would have struck a devastating blow to the Government's proof of these specifications. However, Maj CC asserts he believed the military judge would limit this remedy to the portion of AN's testimony that overlapped the missing statement—that is, up to the point AN was questioned by MSgt PB, before the charged misconduct occurred. As Maj CC explained, trial defense counsel thought such a limited

remedy would be disadvantageous to the Defense because they wanted AN's testimony to be contradicted by MSgt PB.

Therefore, our conclusion regarding this first prong of the *Gooch* test turns on whether it was reasonable for trial defense counsel to forego a R.C.M. 914 motion in the belief the military judge could and would limit the remedy in this way. We conclude it was not reasonable. Several considerations contribute to our conclusion.

First, the language of R.C.M. 914(a) and R.C.M. 914(e) does not suggest the remedy is severable in this way. R.C.M. 914(a) refers to "*any statement* of the witness that *relates to the subject matter* concerning which the witness has testified . . . ." (Emphasis added). By plain meaning, if there exists a statement by a witness that addresses the same subject matter as a portion of the witness's testimony, it would fall within the rule. In describing the remedy, R.C.M. 914(e) provides "the military judge shall order that *the testimony of the witness* be disregarded by the trier of fact . . . ." (Emphasis added.) The rule does not qualify the remedy by providing that only the portion of the witness's testimony that is believed to overlap with the undisclosed statement will be disregarded; it evidently refers to "the testimony" as a whole. Notably, by contrast, R.C.M. 914(c) addresses the situation where only a part of a statement relates to a witness's testimony, and provides a procedure for the military judge to excise the unrelated portions before disclosure. However, no such procedure is provided for dividing a witness's testimony in an equivalent way under R.C.M. 914(e).

In addition, although Maj CC refers to his "prior research and experience litigating this issue," he does not identify any precedent or specific personal experience where an appellate court or trial judge applied R.C.M. 914 in the manner he anticipated here. The Government also fails to identify such precedent. Although "[s]trategic choices made by counsel after a thorough investigation of the law and facts" may be "virtually unchallengeable,'" *Palik*, 84 M.J. at 289 (citing *Strickland*, 466 U.S. at 690–91), a vague reference to research and experience will not defeat an ineffective assistance claim where trial defense counsel made an unreasonable choice under the circumstances. *Cf. Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" (citations omitted)).

To explain why he believed the military judge would instruct the members to disregard only part of AN's testimony, Maj CC cites his understanding of the policy purpose behind R.C.M. 914:

> I understood that the purposes behind R.C.M. 914—and by ex-
> tension, the Jencks Act—are to enhance the accuracy of trial pro-
> ceedings through cross-examination and prevent any unfair ad-
> vantage for the party calling a witness, by providing the oppos-
> ing party with access to the witness's prior statement related to
> the subject matter of their in-court testimony. Accordingly, in
> this case, the only appropriate remedy seemed to be the exclu-
> sion of the initial portion of AN's testimony concerning the
> drunk-and-disorderly incident and the Security Forces response.

From the perspective of a zealous trial defense counsel, we find this reasoning deficient in several respects. As described above, the plain language of R.C.M. 914(a) and R.C.M. 914(e) refers to witness "testimony" as a whole, rather than severable parts. In light of this plain meaning, after AN testified, the Rule provided the Defense a powerful tool to prevent Appellant's conviction for Specifications 6 and 7 of Charge I.

Furthermore, trial defense counsel's reasoning is unconvincing even in terms of the presumed policy or purpose behind R.C.M. 914. Assuming *arguendo* trial defense counsel is correct that the purpose was to "prevent any unfair advantage for the party calling a witness," it is reasonable to conclude R.C.M. 914(e) was intentionally written broadly. In cases where the party calling the witness fails to produce the witness's statement, in many if not most cases the opposing party and military judge could not be sure of the scope of the undisclosed statement, making it unclear what parts of the witness's testimony overlap the statement. With this in mind, having R.C.M. 914(e) provide the straightforward and sure remedy of removing the witness's entire testimony from consideration represents a plausible policy choice behind the broad language of the Rule. Appellant's case is perhaps somewhat unusual in that the statement in question was made in the midst of the events described by AN's testimony; however, her entire testimony was relevant to the charged offenses, which is why trial counsel included the incident with A1C OR and the arrival of security forces in the direct examination.

In addition, even if trial defense counsel believed the military judge was likely only to exclude a portion of AN's testimony, there was little if any risk to seeking remedies under R.C.M. 914 and advocating for the exclusion of her entire testimony at trial. If the military judge removed AN's entire testimony, the Government would lose the essential evidence of the charged misconduct regarding AN. If the military judge unhelpfully ruled he would exclude only part of AN's testimony, there is no reason to believe the Defense could not have withdrawn its motion to compel production. At that point the Government would no longer be failing to comply, no remedy would be warranted, and matters would return to the status quo ante—leaving Appellant no worse off than

he was before, and having preserved the issue for potential appellate review. As the United States Court of Appeals for the Armed Forces (CAAF) recently found in comparable circumstances, "at the time of trial, there was tremendous upside and virtually no downside for the defense to file that R.C.M. 914 motion." *See Palik*, 84 M.J. at 291.

Accordingly, we find Appellant has met his burden to demonstrate his allegations are true and there is no reasonable explanation for trial defense counsel's failure to move for production and relief under R.C.M. 914.

### b. Whether Trial Defense Counsel's Performance Fell Measurably Below the Standard

Next, we conclude trial defense counsel's performance did "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers." *Gooch*, 69 M.J. at 362 (citation omitted). Appellant's case may usefully be compared to *Palik*, where the CAAF recently found ineffective assistance where trial defense counsel failed to bring an R.C.M. 914 motion after a prosecution witness testified. 84 M.J. at 294. The CAAF explained, in pertinent part:

> At the time of [the a]ppellant's court-martial, the law was well settled about what the defense should do in a situation such as this one where a witness testifies, the witness's prior statements were recorded by the Government, and the Government cannot produce that recording because of its own negligence. *See Muwwakkil*, 74 M.J. at 190–94. Namely, the defense should file an R.C.M. 914 motion. Under these circumstances, the trial defense counsel's level of advocacy in this case was indeed deficient because it fell "'measurably below the performance . . . [ordinarily expected] of fallible lawyers.'" *Gooch*, 69 M.J. at 362 (alterations in original) (citation omitted).

*Palik*, 84 M.J. at 293 (second alteration and omission in original). Particular details of *Palik* differ from the instant case—for example, *Palik* involved a recorded witness interview rather than a written statement. *See id*. at 286. However, the general contours of each case are similar, and we find the CAAF's conclusion regarding the applicable standard of performance quoted above informs the resolution of this case.

### c. Whether there was a Reasonable Probability of a Different Result

Turning to the final prong, we find Appellant has demonstrated a reasonable probability of a different result had the Defense filed an R.C.M. 914 motion. *See Gooch*, 69 M.J. at 362 (citation omitted). The parties appear to be in agreement that AN wrote a statement for MSgt PB that related to her testimony at trial, that MSgt PB received the statement, and the Government is now unable

to account for it. Therefore, if the Defense moved for production of the statement, the Government would have been unable to comply. The military judge would have been constrained to apply the remedies prescribed by the Rule: either declare a mistrial or order the court members to disregard AN's testimony. If the military judge declared a mistrial, Appellant would have avoided conviction for Specifications 6 and 7 of Charge I. If the military judge opted to instead order the members to disregard AN's testimony, for the reasons stated above we find at least a "reasonable probability" the military judge would have ordered the court members to disregard AN's entire testimony.

AN was the only direct witness to the charged misconduct (other than Appellant). The Government supplemented AN's testimony with other evidence and testimony. The Government introduced a text message AN sent to TSgt MS the morning after the charged misconduct stating that she "just got raped." TSgt MS testified that, *inter alia*, AN was upset when he subsequently spoke to her on the phone and looked like she had been crying and had a "closed off" body posture when he arrived at her residence. He further testified AN "told [him] one thing led to another in the bedroom when [Appellant] asked to go sleep with her. And she told me she kept telling him to stop and he wouldn't stop. She said she felt helpless." In addition, the Government introduced DNA evidence to the effect that swabs identified as coming from AN's genital area matched Appellant's DNA profile, and swabs taken from Appellant's pubic area identified DNA consistent with AN. However, without AN's testimony describing Appellant performing the specific charged acts without her consent, we find a reasonable probability of a different result sufficient to undermine our confidence in the finding of guilty. *See Datavs*, 71 M.J. at 424 (citation omitted).

Finally, the Government contends Appellant cannot show a reasonable probability of a different result because an R.C.M. 914 motion "likely" would have failed under the good faith loss doctrine. Specifically, the Government suggests MSgt PB in "good faith" "appears to have made the decision not to include the statement in his report." In other words, the Government speculates MSgt PB deliberately discarded or, at a minimum, willfully failed to preserve AN's statement. We are not persuaded such deliberate loss implicates the good faith doctrine, which is "generally limited in its application." *Muwwakkil*, 74 M.J. at 193 (quoting *United States v. Jarrie*, 5 M.J. 193, 195 (C.M.A. 1978)); *see also Palik*, 84 M.J. at 293 ("[The investigator] clearly did not understand a fundamental point: when you record a victim's statement, you need to preserve it.").

For the foregoing reasons, we conclude Appellant was prejudiced by ineffective assistance when his trial defense counsel failed to move for production and seek remedies under R.C.M. 914, and the findings of guilty as to Specifications 6 and 7 of Charge I must be set aside.

**C. Excited Utterance**

**1. Additional Background**

Before trial, the Government moved to preadmit a number of prosecution exhibits. The motion described one of these, PE 11, as a screen shot of text messages between RY and SrA TS (RY's designated driver the evening of the incident) dated 9 August 2020. The Government's motion explained its relevance was "context of [RY]'s reaction and state of mind following the charged misconduct." The motion asserted the messages were admissible as RY's "present sense impression or then existing state of mind" pursuant to Mil. R. Evid. 803(1) and Mil. R. Evid. 803(3). The Defense opposed the preadmission of PE 11.

PE 11 consists of the following exchange of text messages between RY and SrA TS, with the corresponding times indicated, which we reproduce verbatim without modification:

> 0054 RY: Where you
>
> 0058 RY: Went back to base and didn't take me? Tf
>
> 0104 RY: Not trying to be here much longer. I might try to find a ride.
>
> 0110 SrA TS: Otw back
>
> 0111 SrA TS: Might head back soon after getting there, vibe kinda killed
>
> 0113 RY: I'm furious but imma be chill
>
> 0113 SrA TS: You can rant to me after I get bac[k] if you want
>
> 0114 RY: Oh I will
>
> 0114 SrA TS: Tell me max didn't piss you off tho?
>
> 0114 RY: He's weird but he didn't do sh[*]t. It was Sam
>
> 0128 RY: Where u
>
> 0128 SrA TS: Here

On 17 November 2021, SrA TS and RY testified at a pretrial Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing on the motion to preadmit. SrA TS testified that on the night of 8–9 August 2020, he was a designated driver for several people attending a party at Appellant's house, including RY. He testified that at one point after he had driven one individual from the party back to the dormitories on Ramstein AB, he received text messages from RY, which he identified as PE 11, to the effect that RY was furious and wanted to leave the party. From that point, it took SrA TS approximately 30 minutes to return to the

party. SrA TS testified when he picked RY up from the party she seemed "closed off" and "pissed" based on her "[f]acial expression, body language, and voicing that she was upset." RY told SrA TS Appellant had "touched" or "brushed" her "boobs."

RY testified remotely for the hearing via a live video call. She testified that at the party Appellant touched her "thigh" and "chest" without her permission, which made her "incredibly uncomfortable," "annoyed," "angry," and "upset." Afterward, RY began texting SrA TS because she wanted a ride back to Ramstein AB. RY identified PE 11 as these texts. RY testified she sent the first of these texts, with a time stamp of 0054 on 9 August 2020, "after the first time that he touched [her]." She sent the last of her texts in PE 11, with a time stamp of 0128, "right after" Appellant touched her the second time.

At the conclusion of the motion hearings on 17 November 2021, the military judge deferred ruling on the admissibility of PE 11 until the court-martial resumed. During the next round of motion hearings on 10–13 January 2022, the military judge received evidence on a defense motion related to the admissibility of oral statements RY made after SrA TS returned to the party at Appellant's house. SrA TS testified, *inter alia*, that when he returned, RY was sitting on stairs inside the house. SrA TS described RY as "closed off," with her "arms crossed." He continued, she "seemed like she didn't want to talk to anybody, which is how she gets whenever she is upset about something and that's how she handles being upset." SrA TS "asked how she was doing," and RY responded that "she was good." SrA TS then told RY, "okay, let's talk," after which RY "told [him] that [Appellant] brush[ed]/touched her boobs three times that night." RY later made additional statements in the presence of SrA TS and another Airman as they drove back to Ramstein AB.

The military judge eventually issued a written ruling which held PE 11 was admissible as an "excited utterance." In his "Essential Findings of Fact," the military judge stated RY sent an additional text to SrA TS, after those quoted above, in which RY stated, "He grabbed my titty." However, no such text appears in PE 11 or was offered by the Government. The ruling also stated, "The burden of persuasion on this matter rests with the defense."

By a preponderance of the evidence, the military judge found that Appellant touched RY on the thigh and chest multiple times, which qualified as a "startling event." The military judge further found RY was under a "continued state of agitation and excitement" when she sent the text messages, citing RY's testimony, the "temporal proximity of her text messages in relation to the unwanted touchings," and her description of herself as "furious" in a text message. The military judge further found the probative value of PE 11 was not substantially outweighed by the danger of unfair prejudice or any other countervailing consideration, and was therefore also admissible under Mil. R. Evid.

403. In contrast, the military judge found the statements RY made after SrA TS returned to Appellant's house that night were not made under the stress of a startling event.

RY did not testify during the findings portion of the trial. In order to prove Specification 9 of Charge I—alleging Appellant touched RY's breast without her consent and with the intent to abuse, humiliate, harass, or degrade her— the Government relied on PE 11 and the testimony of SrA CS as described *supra*, at Section I.C, as well as testimony from SrA TS to the effect that RY was upset and closed off when he returned Appellant's house.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)).

Mil. R. Evid. 803(2) provides that an "excited utterance," defined as a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is an exception to the general prohibition on hearsay evidence. *See* Mil. R. Evid. 801, 802; *Bowen*, 76 M.J. at 87–88. "[T]o qualify as an excited utterance: (1) the statement must be 'spontaneous, excited or impulsive rather than the product of reflection and deliberation'; (2) the event prompting the utterance must be 'startling'; and (3) the declarant must be 'under the stress of excitement caused by the event.'" *United States v. Henry*, 81 M.J. 91, 96 (C.A.A.F. 2021) (quoting *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987)). "The proponent of the excited utterance has the burden to show by a preponderance of the evidence that each element is met." *Id.* (citation omitted). "The guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event." *United States v. Chandler*, 39 M.J. 119, 123 (C.M.A. 1994) (citation omitted). "As a general proposition, where a statement relating to a startling event does not immediately follow that event, there is a strong presumption against admissibility under M.R.E. 803(2)." *Donaldson*, 58 M.J. at 484 (citation omitted).

> To determine whether a declarant was under the stress of a startling event at the time of a statement, courts look to a number of factors, such as "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental

> condition of the declarant, the characteristics of the event, and the subject matter of the statement."

*United States v. Abdirahman*, 66 M.J. 668, 676 (C.A.A.F. 2008) (quoting *Donaldson*, 58 M.J. at 483 (internal quotation marks and additional citation omitted)).

Whether an error is harmless is a question of law we review de novo. *Bowen*, 76 M.J. at 87 (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (internal quotation marks omitted) (quoting *McCollum*, 58 M.J. at 342). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

### 3. Analysis

Appellant contends the military judge abused his discretion by admitting PE 11 as an excited utterance. We agree.

As an initial matter, although we review the military judge's ruling for an abuse of discretion, two errors by the military judge erode our confidence in his analysis here. First, as noted above, the military judge found the texts at issue include one from RY to SrA TS which read, "He grabbed my titty." The Government concedes no such text is in the record and the military judge erred in this respect. Second, the military judge erroneously stated the Defense bore the burden of persuasion with regard to the exclusion of PE 11, citing R.C.M. 905(c)(1). The Government concedes that, in reality, the burden of persuasion lay with the Prosecution as the proponent of the excited utterance. *See Henry*, 81 M.J. at 96. Nevertheless, these errors are not necessarily fatal in and of themselves. The essential question is whether a preponderance of the actual evidence supports admitting PE 11 as an excited utterance under the three-part *Arnold* test.

Turning now to that test, we do not find the military judge abused his discretion when he concluded RY being touched on her breast and thigh without consent qualified as a "startling event." However, the record does not support that RY's texts were "spontaneous, excited or impulsive rather than the product of reflection and deliberation," or that RY remained "under the stress of excitement caused by the event" when she wrote all of the texts. *See Henry*, 81 M.J. at 96 (quoting *Arnold*, 25 M.J. at 132). Accordingly, the military judge's findings were clearly erroneous in that respect, and he erred by admitting PE 11 in its entirety as an excited utterance.

The evidence supports finding that RY remained angry and upset for some time after Appellant touched her breast and thigh. However, an utterance is not necessarily "spontaneous, excited, or impulsive" simply because the declarant is angry or upset.[19] A person may be angry, even "furious," yet also capable of reflection and deliberation. Accordingly, we consider the *Donaldson* factors to assist our analysis as to whether RY was not only angry but remained in a state of stressed excitement that precluded reflection or deliberation when she wrote the texts.[20]

First, there was a significant lapse of time between when Appellant touched RY and when she wrote the most significant of the texts in question. According to RY's testimony, she wrote her initial texts at 0054 and 0055 asking where SrA TS was "after" Appellant touched her the first time. At least ten minutes had elapsed by the time she sent the next text at 0104, stating she might try to find another ride. At least 19 minutes had elapsed since the touching by the time she texted "I'm furious but imma be chill," and at least 20 minutes by the time she identified Appellant as the cause of her anger. Of course, the circumstances of each case vary, and we do not minimize the significance of RY being involuntarily touched on the breast or inner thigh. However, a lapse of 19 or 20 minutes represents an opportunity to return to a relatively calm state of mind conducive to reflection and deliberation, while also remaining annoyed, angry, or upset. The fact that these texts did not "immediately follow" the startling event weighs against admission. *See Donaldson*, 58 M.J. at 484.[21]

---

[19] The military judge cited *United States v. Thomas*, ARMY 20021181, 2007 CCA LEXIS 610 (A. Ct. Crim. App. 23 Jan. 2007) (unpub. op.), for the proposition that, in the military judge's words, "being upset and angry [i]s commensurate with being in an excited state immediately after a startling event." (Emphasis omitted). Apart from *Thomas* being merely persuasive authority, we do not find *Thomas* supports this proposition. The facts involved in our sister court's unpublished opinion were considerably different from the instant case, and in addition to the fact the declarant was angry, the circumstances, tone of voice, and content of the utterances in question appear to have played a significant role in our sister court's conclusion. *See id*. at *7–10. Of course, one who makes an excited utterance may be angry (or surprised, or frightened, or in pain, among other conditions), but being angry does not mean one's statements are inevitably spontaneous, excited, or impulsive, rather than the product of reflection or deliberation. We do not find *Thomas* holds otherwise.

[20] Notably, the military judge cited *Donaldson* in his ruling, but incorporated little of it in his analysis.

[21] The fact that RY's statements were written text messages rather than spoken has not materially influenced our analysis of this issue. *See United States v. Smith*, 83 M.J.

Second, three of RY's texts, including the most significant ones indicating Appellant had made her "furious," were in response to texts from SrA TS. The fact that RY was in significant part responding SrA TS's messages, rather than "speaking" spontaneously, also weighs against a finding that RY's texts were "spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Henry*, 81 M.J. at 96 (citation omitted).

Third, with respect to age, "courts have been more flexible in cases in which the declarant is young." *Donaldson*, 58 M.J. at 484 (citations omitted). However, RY was an adult. There is no basis to conclude RY's age made her more susceptible to an increased or prolonged state of excitement.

Fourth, with respect to the physical and mental condition of the declarant, although not developed in detail on the record, the circumstances imply RY was consuming alcohol at the party. However, nothing in the record indicates RY was significantly impaired by alcohol or under any other influence or condition that would make her particularly susceptible to either heightened or prolonged excitement or, on the other hand, less susceptible to excitement. On balance, this factor does not particularly weigh in either direction.

Similarly, we find the characteristics of the event do not particularly weigh on either side. On one hand, being touched on the breast or inner thigh without consent would understandably make RY, as she testified, "annoyed," "upset," and "angry." However, being touched in such a way at a party does not necessarily suggest an inability to reflect or deliberate.

Finally, we find the subject matter of the statements weighs against admission. From the beginning, RY's text messages suggest they are products of reflection and deliberation rather than spontaneous exclamations. RY testified Appellant touched her on the breast or thigh. This led her to decide she wanted to leave the party. In pursuit of that end, she texted her designated driver to find out where he was. Her initial texts were not pleading for immediate help or accusing Appellant of assaulting her. This indicates reflection and deliberation. Significantly, RY testified Appellant did not touch her the second time until just before she sent her final text in PE 11, "Where u," at 0128. Thus the most significant texts stating that RY was furious and identifying Appellant were made at least 19 or 20 minutes after Appellant touched her and she began implementing her plan to leave the party.

Accordingly, considered together, we find the *Donaldson* factors weigh firmly against admission of PE 11, especially with regard to the most significant of RY's text messages. Being angry is not per se inconsistent with

---

350, 357–58 (C.A.A.F. 2023) (explaining that written messages may be spontaneous) (citations omitted).

reflection and deliberation. Sufficient time—19 or 20 minutes—elapsed after the inciting incident for RY to regain her composure before she sent the most relevant text messages, even if she was still "annoyed" or "angry." These most significant texts were composed in response to SrA CS's queries rather than sent spontaneously. Furthermore, RY's texts indicated she was implementing a plan to leave the party by contacting her previously designated driver, indicating deliberate thought. For the foregoing reasons, we find the military judge abused his discretion by admitting PE 11 as an excited utterance.

Turning to the question of prejudice, we find the *Kerr* factors weigh against finding the error was harmless. First, without PE 11, the Government's proof as to Specification 9 of Charge I was not particularly strong. The obvious weakness was that the alleged victim of the offense, RY, did not testify. The Government primarily relied on the testimony of RY's friend SrA CS, who testified she saw RY exhibit negative body language when Appellant sat down to talk with her, and then saw Appellant touch RY's breast as he stood up. However, she could not hear or could not remember what they were saying to each other. In addition, on cross-examination SrA CS said she could not remember telling OSI that "the man[22] accidentally fell on [RY];" however, the Defense called the OSI agent who interviewed SrA CS, who testified she told him "it appeared to look like an accidental fall forward."

Next, on balance, the Defense's case was neither particularly weak nor strong with respect to this specification. Part of the Defense's strategy on cross-examination—apparently derived from SrA CS's failure to identify Appellant by name or description during her OSI interview—was to suggest SrA CS might have later misidentified Appellant as the perpetrator. This effort evidently fell flat. However, eliciting that SrA CS told OSI the touch might have looked like an accident was potentially a much more telling blow. We must also note the Government's erroneous failure to disclose SrA CS's self-professed bias against Appellant, described *supra*, was potentially impactful here. If PE 11 had been excluded, RY's failure to testify would have loomed even larger. The Defense's impeachment of SrA CS's attempt to downplay the possibility the contact she observed was accidental may have received a substantial boost from evidence of SrA CS's admitted preexisting dislike for Appellant, and her predisposition to interpret his actions in a negative light.

Under the circumstances, the materiality of PE 11 was high. RY herself did not testify, without explanation. In RY's absence, PE 11 played an important role in supporting SrA CS's testimony by demonstrating that at the time, RY did feel wronged specifically by Appellant. In addition, the quality of the

---

[22] SrA CS did not identify Appellant during her OSI interview.

evidence was sound. SrA TS explained to the court members what PE 11 was, and they had no reason to conclude these texts were not the statements of RY.

Accordingly, and particularly in conjunction with the Government's discovery violations explained above, we find the Government cannot demonstrate the erroneous admission of PE 11 had no substantial influence on the findings. Therefore, we conclude the finding of guilty as to Specification 9 of Charge I must be set aside.

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. A rehearing is authorized. The record is returned to The Judge Advocate General for further proceedings consistent with this opinion.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court